# United States Court of Appeals
## For the First Circuit

No. 13-2040

KATHERINE M. CADY, as Personal Representative
of the Estate of Paul Victor Galambos, III,

Plaintiff, Appellee,

v.

BARBARA WALSH; MICHAEL TRUEWORTHY; LINDA WILLIAMS,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Lynch, Chief Judge,
Selya and Kayatta, Circuit Judges.

Michael E. Saucier, with whom Robert C. Hatch, Hillary J. Bouchard, and Thompson & Bowie were on brief, for appellants.
Eric M. Mehnert, with whom Hawkes & Mehnert, LLP was on brief, for appellee.

June 4, 2014

**LYNCH, Chief Judge**.  Katherine Cady, on behalf of the estate of her son, Paul Victor Galambos, III, brought this 42 U.S.C. § 1983 action after Galambos's death from self-inflicted injuries that he suffered while he was a pretrial detainee at the Cumberland County Jail (CCJ).  The action alleged that employees of Corizon, Inc., the private company providing healthcare services at CCJ, were deliberately indifferent to Galambos's serious medical needs in violation of his Fourteenth Amendment rights.  The defendants sought summary judgment, arguing that they were within a category of private employees protected by qualified immunity by virtue of their duties, and were also entitled to immunity on the particular facts.

The district court assumed dubitante that the employees fell into a category of private employees eligible for qualified immunity, and denied the summary judgment motions filed by defendants Michael Trueworthy, Barbara Walsh, and Linda Williams, all employees of Corizon.  It reasoned, after a detailed review of the facts, that there remained material and disputed issues of fact as to the claims against all three individuals which precluded the grant of immunity at this point.

The three defendants now appeal, arguing that they are entitled to qualified immunity.  The plaintiff, noting there are material issues of fact in dispute, including conflicts in the opinions of expert witnesses, argues that there is no appellate

-2-

jurisdiction under the doctrine of <u>Johnson</u> v. <u>Jones</u>, 515 U.S. 304 (1995), even if the defendants were theoretically eligible for the protections of qualified immunity.  Like the district court, we bypass the question of whether qualified immunity is categorically unavailable to these defendants, because the district court's denial of immunity turned on findings that there remain disputed issues of material fact and inference.  We do not have jurisdiction over this interlocutory appeal under <u>Johnson</u>.  We dismiss this appeal for want of appellate jurisdiction.

I.

We have jurisdiction over an interlocutory appeal of a denial of summary judgment on qualified immunity only insofar as the appeal rests on legal, rather than factual grounds.  <u>See</u> <u>Johnson</u>, 515 U.S. at 313.  We therefore summarize the facts in the light most favorable to the non-moving party, taking as unchallenged any inferences that the district court drew in that party's favor.

A.        <u>Background and Named Defendants</u>

Corizon is a private independent contractor that provided healthcare services to inmates at CCJ under a contract with CCJ effective January 1, 2007 through December 31, 2009.[1]  Corizon was

_____

[1]  Corizon was paid a management fee for its services.  It is unclear from the record what the relationship was between costs incurred and the management fee.  The parties have not adequately briefed that question.

responsible for healthcare at CCJ, and to that end developed a set of governing policies and procedures. Corizon was also required to regularly confer with the Cumberland County Sheriff or his designee concerning both existing healthcare procedures and any changes to those procedures.

### 1.  Michael Trueworthy

Defendant Michael Trueworthy, a psychiatric Nurse Practitioner, worked as a per diem employee of Corizon from August through December 2008, and reported directly to Dr. Alfonso Corona, Corizon's psychiatrist for CCJ. Trueworthy saw inmates for medication evaluation and management, and renewed prescriptions for inmates who had already been prescribed those medications. He was never on-call during his employment at CCJ, and was not present at the facility for all emergencies. Generally, social workers at CCJ would provide Trueworthy with lists of inmates for him to attend to during his shifts.

### 2.  Barbara Walsh

Defendant Barbara Walsh, a Registered Nurse, became Corizon's director of nursing in 2006, and she was employed in that position during the 2008 events that gave rise to this case. She supervised the infirmary and the nursing staff. She described CCJ as "chaotically busy." She reported directly to Corizon's Health Services Administrator, Diane North. North is not a named defendant. Walsh was a party to the "constant discussion among the

Corizon staff" regarding sending inmates out to the emergency room (ER). The cost of having an inmate transported to a local ER by ambulance had risen dramatically, and was nearly $3,000 in the fall of 2008. Corizon apparently wanted to keep costs contained, and also assure that nurses were performing only medically necessary actions. In light of these concerns, Walsh instructed the nursing staff to contact her at any time, even when she was not on duty, so that she could assess a given situation before deciding to send an inmate out to the ER for additional care. According to the parties' stipulated facts, the reason given for this policy was that "the [staff nurses'] excuse of their nursing licenses being at risk was not an acceptable basis for a decision to send an inmate out to the ER."

### 3. Linda Williams

Defendant Linda Williams, a Licensed Clinical Social Worker, was responsible for assessing inmates' current mental health status. She undertook these health assessments from outside inmates' cells, and never entered Galambos's cell to assess him. When Galambos first came to CCJ, Williams took part in his intake and initial evaluations and subsequent evaluations. From December 2 through December 11, 2008, Williams observed Galambos each day and spoke with him on some days.

B.          Events at CCJ

Galambos entered CCJ as a pretrial detainee on August 3, 2008, following his arrest for robbery, refusal to submit to arrest, and violation of bail conditions.  He had an extensive history of mental illness and substance abuse, was diagnosed at the time with schizoaffective disorder, had a history of suicide attempts, and had previously received in-patient psychiatric treatment.

On his arrival at CCJ, Galambos resisted being fingerprinted and headbutted an intake officer.  His condition was described by the plaintiff's expert as "actively psychotic,"[2] and a jury could so conclude.  He initially refused his medications and he was placed on suicide watch, where he remained for a few days. At this point, Corizon's mental health staff, including Williams, was aware of Galambos's history of mental illness.  They had access to his past records, including from his stay at an in-patient treatment program at Spring Harbor Hospital called ACCESS, where Galambos had been admitted in the past, most recently in June 2008.

---

[2]    The three Corizon defendants objected to the magistrate judge's admission of statements from the plaintiff's two experts, Dr. Grassian and Dr. Jagminas, on the grounds that they did not research standards of mental health care for inmates and were relying on a malpractice standard of care.  The magistrate judge did not conduct an exhaustive Rule 702 inquiry, but also overruled the defendants' objections and included several statements from the experts in the Recommended Decision.

Dr. Grassian, one of the plaintiff's experts, said the record shows no evidence that Trueworthy ever reviewed those records.

Galambos agreed to take an oral dose of Haldol on August 6, at which point he was "stepped down" to "psych" watch from suicide watch. He was taken off psych watch on August 10.

During September 2008, Galambos underwent additional evaluations that resulted in a medication recommendation. Trueworthy offered a recommendation and medication plan on September 12, which recommended continued use of the medications he was on when he entered CCJ: Zyprexa (for psychosis) and Cogentin (for potential side effects of Zyprexa). Trueworthy was aware that Galambos had a history of suicide attempts and believed that Galambos's prognosis was poor without proper medication management. Nonetheless, Trueworthy said he believed that because Galambos was "logical and involved" as of September 12, Trueworthy did not need to see him regularly. The plaintiff's expert, Dr. Grassian, has noted that on September 9, Galambos was observed to be actively psychotic; Dr. Grassian opined that Trueworthy's September 12 plan, which left Galambos's medication regimen unchanged, was a violation of "any standard of care." He also opined that the failure of the record to note Galambos's activity from September to November was unacceptable.

By November, Williams did note that Galambos exhibited a pattern of irregular acceptance of his medication. There is a

dispute over whether CCJ could forcibly administer medication to inmates. On November 8, Galambos submitted a medical request slip asking that he be given Seroquel instead of Zyprexa. There was no response and, according to the plaintiff's expert, the record contains no explanation for ignoring Galambos's request. Trueworthy and Dr. Corona had previously discussed safety issues surrounding prescribing Seroquel in a correctional setting, but it was listed on Corizon's medication formulary at the time.

On November 8, Galambos was placed in maximum security after assaulting another inmate, and he remained there until November 12. During this period, Galambos asked to see the psychiatrist and reiterated his medication change request. On November 11, Debra Konieczko, a Licensed Clinical Social Worker who had treated Galambos when he was in the ACCESS program, visited Galambos in CCJ. After meeting with Galambos and observing that he was "highly agitated and anxious," "demonstrating psychomotor agitation," and was "difficult to interrupt," Konieczko spoke with a Corizon social worker about Galambos. The Corizon social worker met with Galambos and reportedly did not observe the problems that Konieczko noted. After Galambos was allowed out of maximum security on November 12, he continued to ask to switch to Seroquel, saying that Zyprexa made him feel sedated in the morning and unable to sleep at night.

On November 15, Corizon accepted from Galambos a signed "release of responsibility" form that allowed him to refuse the Zyprexa. On November 17, he again asked to see a psychiatrist for a change in medication, and also asked for a change of housing, reporting that other inmates were threatening to kill him. No change in medication took place, and on November 17, Trueworthy renewed Galambos's Zyprexa and Cogentin prescriptions.

Galambos's chart indicates that at some point on December 1, he completed a "Request Slip" seeking mental health services, on which he indicated: "I need to find out what meds will work for me." Also on December 1, Galambos met with Trueworthy to discuss his medication situation for the first time since Galambos began requesting new medication in early November. Galambos told Trueworthy that he had not taken the Zyprexa for a week. Trueworthy did not discuss substitute medications with Galambos. That Galambos was no longer on his medication did not concern Trueworthy, because Trueworthy "believed that Galambos already would have had problems [due to stopping his medication] since he had not been taking Zyprexa for a while" as of that date.

As of this December 1 meeting, Trueworthy discontinued all of Galambos's psychiatric medications, which meant that Galambos would no longer be offered medication on a daily basis. Trueworthy did not see Galambos again, and he maintains that he never saw Galambos's December 1 Request Slip.

-9-

Sometime in the 24 hours following his meeting with Trueworthy, Galambos verbally threatened to commit suicide to a correctional officer. Social worker Williams met with Galambos on December 2 to discuss the threat, and at the meeting he told her that he was not serious about committing suicide and that he wanted to change his housing assignment so he was not housed with pedophiles. According to Williams, it was common for inmates to complain about being housed with inmates charged with sex crimes. But according to Dr. Grassian's assessment of Galambos's records, Williams made no effort to determine whether Galambos was or was not housed with pedophiles and so did not make the differential diagnosis as to whether his fears were reasonable or delusional. Dr. Grassian opined that Williams should have undertaken such an inquiry. On December 2 Williams was not concerned that Galambos was suicidal based on her overall assessment, which included that Galambos told her he was not suicidal. Dr. Grassian called Williams's assessment at this juncture and failure to inquire further into Galambos's mental state a "cavalier dismissal of his suicidality," and opined that it was "grossly negligent" and "a failure to meet her professional responsibilities." The record suggests that Williams did not discuss Galambos's medication situation with him on this date. The information that he was not on any medication was set forth in his file.

Despite Williams's assessment, Galambos in fact tried to commit suicide that night. On the evening of December 2, Galambos was found in his cell with a self-inflicted stab wound in his neck, made with a pencil that was found under his bed. The stab wound narrowly missed his carotid artery. The plaintiff characterizes this as a suicidal action and a sign of how very sick and in need of care Galambos was. He was sent outside the jail to Brighton First Care, an affiliated medical center, for appropriate medical services. He was placed on suicide watch upon his December 3 return to CCJ. On December 3, Williams observed that Galambos was talking to himself, laughing, and standing naked in front of the window. He was not responsive to her attempts to engage him in conversation. Williams placed a call to Dr. Corona regarding Galambos's condition, and Dr. Corona recommended giving him a dose of Abilify, which was done. The next day, Williams again observed Galambos and thought that he was talking to someone who was not there and did not appear to be thinking coherently.

On December 5 and 6, Galambos continued to regress. He reported to Williams that he was hearing voices and that he felt like someone had "stolen his brain." Dr. Corona observed that Galambos was "floridly psychotic" when he examined him on December 6. Dr. Corona and Williams both observed Galambos standing on the table in his cell, talking to the wall. The Facility Hot Book indicates that on December 7 the water was turned off in Galambos's

cell because he had been trying to fill the sink and inhale the water.  On December 8, Galambos's condition continued to worsen, and he was unable to hold a conversation.

In the afternoon, Galambos did what is referred to at several points in the record as a "swan dive": he stood naked on top of the table in his cell, and while a staff member was trying to talk him down, he jumped into the air and spun around to land on his upper back and shoulders on the cement floor of the cell.  The staff members were concerned and immediately brought Galambos to the medical unit to receive emergency attention.  However, he was not sent out to a hospital that day for treatment of his injuries.

He was badly bruised by the fall, and though the diagnosis would not be confirmed until two days later when he was sent out to a hospital following a different incident, he sustained several broken ribs and a transverse process fracture.  One of the plaintiff's experts also opined that Galambos likely suffered a concussion and had a serious head injury.

When Galambos was in the medical unit following this incident, Director of Nursing Walsh performed a "'walk through' assessment" of him, but did not document her observations.  Galambos was placed on suicide observation in a cell in the medical unit, but was not admitted to the medical infirmary, where he would have been seen by a doctor.  Walsh could not recall Galambos receiving any x-ray services in the medical unit either.  Walsh

asserts that she did not consider this incident to be an emergency situation, and that she considered Galambos's jump from the table "aberrant behavior" rather than a "serious suicide attempt."

Until this point, Williams said that she felt that CCJ was capable of treating Galambos. It was only after the "swan dive" incident that Williams felt that Galambos should be transferred to Riverview, a psychiatric facility.[3] Acting within her authority, she then faxed the transfer requests for Galambos and another inmate on the morning of December 9. She had not done so for Galambos before and in particular had not done so after Galambos stabbed himself in the neck with a pencil. Soon after making this inquiry, she learned that Riverview did not have the capacity to admit Galambos at that point and that he would be put on the waiting list. A Riverview staff member suggested to Williams that Spring Harbor, a private hospital, might be an alternative placement. There is no evidence that Williams attempted to follow up on the Spring Harbor option. Williams did not contact Dr. Corona at this point, nor did anyone else.

Rather than being placed in some sort of outside medical facility, Galambos remained in his cell, on suicide watch, in the medical unit.

---

[3] Dr. Grassian has opined that had Galambos been in a psychiatric hospital, he would not have had a table or platform from which he could have done a swan dive, and the walls would have been padded.

On December 10, Williams found Galambos lying on the floor of his cell with blood on his face. He was not responsive to her. A nurse treated his wounds, and Galambos told her that he fell off his toilet and was suicidal. Williams placed a call to the Maine Attorney General's Office to explore the possibility of securing an expedited transfer to Riverview. Later that afternoon, a correctional officer observed Galambos lurch forward and down and after making no attempt to break his fall, hitting his nose and face on the floor. This, in addition to his injuries from the December 8 jump from the table, would have caused him significant pain. Walsh spoke with Galambos and asked if she could give him some medication. He responded, "yes, I'll take anything at this point." Based on this consent, Walsh sought and received an order for a heavy dose of emergency psychotropic medication to be administered. In the view of the plaintiff's expert, Galambos was overdosed in a dangerous manner, and that may have been a contributing factor in his death.

To deal with Galambos's obviously out-of-control behavior, several staff members, including Walsh and Health Services Administrator North, decided that the use of restraints was necessary. Galambos was put into a pro-restraint chair, covered with a blanket to preserve his privacy, and was given this heavy, emergency dose of medication before he was strapped in. At this point, he was observed to be calm and cooperating. When he

-14-

was strapped into the chair at approximately 2:40 PM, he began yelling loudly. He was told that he would be released from the restraint chair when he calmed down and stopped yelling. One of the plaintiff's experts, Dr. Jagminas, opined that given Galambos's injuries from the December 8 incident -- including broken ribs -- being strapped into a chair would have been very painful. About ninety minutes later, after he had calmed down, he was released from the restraint chair, and was released back to his cell in the medical unit at about 4 PM.

Walsh believed the use of the restraint chair was appropriate because Galambos "was in a crisis," consisting of "his various actions of self-harm, but also . . . being completely undressed, urinating, . . . and yelling." By contrast, the plaintiff's experts believe the appropriate response was not overmedication and restraint, but placement in a psychiatric hospital. Dr. Grassian has opined that under the circumstances -- and given how bruised Galambos was from jumping off the table and landing on his back and shoulders -- putting him in a restraint was "very, very dangerous." Dr. Grassian also opined that the emergency dose of medication given to Galambos that afternoon overmedicated him in a dangerous manner.

By 6 PM that evening, after his release from the restraint chair, Galambos was observed pacing and banging his head off the wall in his cell. At about 6:10 PM, he was given an

intramuscular injection of Ativan while officers restrained him. The needle broke off the syringe as the medication was being administered, so after the treating nurse obtained a new syringe, Galambos received the full dose at about 6:20 PM. By 6:30 PM, he was naked on the floor of his cell, had urinated on the floor, and was largely incoherent. The treating nurse called Corizon's medical director, Dr. Todd Tritch,[4] to evaluate Galambos.

Dr. Tritch found contusions on the front of Galambos's head with fresh blood, along with contusions on his right shoulder. Dr. Tritch recommended Galambos be sent to the hospital ER at Maine Medical Center (MMC) for a comprehensive assessment. The responding emergency medical technicians that arrived to take Galambos to the ER were told about Galambos's most recent, presenting problems, but were not told about Galambos's somersault from the table in his cell two days earlier. Walsh asserts that there was no need to advise the medical center about that incident. Galambos was admitted to MMC with fractures of the transverse process and multiple rib fractures, and was kept overnight at the hospital for observation.

On December 11, Williams, working with Galambos's attorney, began the process of having Galambos civilly committed so that he could be transferred to Riverview upon his release from the

---

[4] Plaintiff has stipulated the dismissal of her claims against Dr. Tritch, and we do not discuss them here.

emergency room. However, Riverview required intake to take place during the facility's regular hours, and so Galambos could not go directly from MMC to Riverview. He was discharged back to CCJ at around 5 PM on December 11. Upon his return to CCJ, Galambos was housed in a cell under Suicide Watch Observation. That cell was under "one-on-one" watch, which required a CCJ correctional officer to keep constant visual contact on Galambos at all times. That evening, Galambos complained to the correctional officers that he was in pain, and he was given ibuprofen. He then shoved the paper medication cup into his nostril, where it was removed by the nurse on duty with tweezers. Galambos was then given a dose of Haldol "for a psychiatric or behavioral emergency."

At approximately 7:20 in the morning on December 12, a correctional officer observed Galambos get up and then fall face down on the floor, and then get up and fall again, striking his head against the wall. When the staff members entered his cell to assist him, they discovered that Galambos was not responsive and had no pulse. He was pronounced dead soon after.

The cause of death was later determined to be acute pulmonary thromboemboli, caused by deep leg vein thrombosis, caused in turn by self-inflicted blunt force trauma. According to two physicians testifying as experts on behalf of the plaintiff, the heavy dose of emergency medication on December 10 (which rendered Galambos nearly comatose) and the use of the pro-restraint chair

following the injuries Galambos sustained when he jumped off the table both significantly increased the risk of developing thrombosis and were likely contributing factors in causing Galambos's death.

C.        Procedural History

On January 9, 2012, Cady filed a Third Amended Complaint in the District of Maine raising a claim under 42 U.S.C. § 1983 that defendants Trueworthy, Walsh, and Williams[5] were deliberately indifferent to Galambos's serious medical needs.[6]  On October 24, Trueworthy, Walsh, and Williams each filed a motion for summary judgment, arguing that their performance did not fall so low as to constitute deliberate indifference and that they were entitled to qualified immunity.

On March 22, 2013, the magistrate judge issued a thorough, 86-page Recommended Decision denying the defendants' motions for summary judgment.  The recommendation expressed doubt

<hr />

[5]    Cady also named Cumberland County and several county employees as defendants.  The district judge granted all of the county defendants' motions for summary judgment, and they are not involved in this appeal.
     Corizon, Inc. was also a named defendant, and the district court denied its motion for summary judgment.  The company has not appealed that decision; the only claims before us now are the ones against defendants Trueworthy, Walsh, and Williams.

[6]    Cady also brought a claim under the analogous Maine Civil Rights Act, Me. Rev. Stat. tit. 5, § 4682. The parties do not dispute that the two claims are analyzed co-extensively.  See Berube v. Conley, 506 F.3d 79, 85 (1st Cir. 2007) ("The disposition of a 42 U.S.C. § 1983 claim also controls a claim under the [Maine Civil Rights Act].").

that these defendants, as employees of a private corporation performing state functions, would be entitled to qualified immunity under Richardson v. McKnight, 521 U.S. 299 (1997), but in light of the relative uncertainty surrounding that question of law, the magistrate judge included an alternative recommendation, in which she assumed that qualified immunity would be available to these defendants.

Under that alternative recommendation, the magistrate judge concluded that as to each of the three defendants, there remained genuine issues of fact in dispute as to whether their acts and omissions constituted deliberate indifference. See Coscia v. Town of Pembroke, 659 F.3d 37, 39 (1st Cir. 2011) ("A state and its subdivisions are under a substantive obligation imposed by the Due Process Clause of the Fourteenth Amendment to refrain at least from treating a pretrial detainee with deliberate indifference to a substantial risk of serious harm to health."). On that basis, the magistrate judge recommended denying the defendants' motions for summary judgment.

As to each defendant, the magistrate judge concluded that even if they were not categorically disqualified from claiming qualified immunity, the record was sufficient for a "reasonable finder of fact" to conclude "based on the evidence and permissible inferences therefrom" that each defendant "knew or should have known that Galambos's psychotic condition reflected an extremely

-19-

serious medical need that, if left untreated, would generate a substantial risk of serious harm to his health and safety." Cady v. Cumberland Cnty. Jail, No. 2:10-cv-00512, 2013 WL 3967486, at *26, *28, *30 (D. Me. Aug. 1, 2013); cf. Coscia, 659 F.3d at 39 (noting that for pretrial detainees, proof of deliberate indifference "requires a showing of greater culpability than negligence but less than a purpose to do harm" and may "consist of showing a conscious failure to provide medical services where they would be reasonably appropriate").

As to Trueworthy, the magistrate judge concluded that a jury could find that the decision to order a stop to the offering of prescribed medications on December 1 was an act of deliberate indifference that may have been a substantial factor in bringing about Galambos's rapid decompensation in the days that followed. The magistrate judge also noted that a reasonable juror could consider the absence of counseling to be further evidence of deliberately indifferent medical care; Trueworthy contends that Corizon policies called for counseling at the December 1 juncture, but also contends "that there is no evidence that counseling did not occur, even if he did not do it himself."

The magistrate judge found that based on the record, a reasonable finder of fact could have concluded the following as to Walsh: she knew about Galambos's rapid regression in December 2008; she was directly involved in his care based on her triage

responsibilities; the December 8 jump from the table deserved an emergency response by health practitioners or, at the least, demonstrated a need to change the permissive approach to Galambos's refusal to take his medication; the failure to send him out to the ER on December 8 was likely related to the fact that he had been sent out on December 2 after the pencil-stab incident; the December 10 incident was a foreseeable consequence of a deliberately indifferent approach to medical care; the use of the restraint chair followed from a deliberately indifferent approach to Galambos's care; and that these events involved "supervisory acquiescence and participation directly related to the deprivation." Cady, 2013 WL 3967486, at *28.

Finally, as to Williams, the magistrate judge recognized that though Williams had taken affirmative steps, including an unsuccessful December 9 effort at having Galambos transferred to Riverview, the total picture, the decisions she made, and the timing of her actions could support a finding of deliberate indifference in light of Galambos's ever-escalating psychosis and attempts at suicide:

> Although Williams did something or assessed something at each new stage of Galambos's slide into psychosis, it does not follow that she is insulated from liability on that basis. Nor is it appropriate at summary judgment for Williams to expect the court to view the [December 2] pencil stab incident as superficial or a mere gesture, let alone to color the entire course of events based on an evaluation of the significance of that one

-21-

incident. That event, which a reasonable finder of fact could regard as a serious suicide attempt, occurred more than a week before Galambos's death and the change in medication recommendation did not change the fact that Galambos continued to reject medication and continued to slide deeper into psychosis. While it is true that Williams is not responsible for Galambos's refusal to take his medications or for the existence of a table in his cell, what is of concern here is the nature of her response in light of these and other facts known to her at the time. One possible finding on this record is that Williams's acts and omissions demonstrated deliberate indifference to serious medical needs and a substantial risk of serious harm.

Id. at *30 (record citations omitted) (emphasis added).

After making a de novo determination of all matters addressed by the magistrate judge, the district court adopted the Recommended Decision in full. In particular, the district court agreed with the magistrate judge's "prudent decision to assume for the sake of argument that the Corizon defendants are entitled to qualified immunity," and agreed that even if qualified immunity were available as a defense, it would fail. Id. at *1. The court denied the defendants' motions for summary judgment, leaving the deliberate indifference claims for trial. This appeal followed.

II.

Ordinarily, we hear appeals only from final orders and decisions. See 28 U.S.C. § 1291; Whitfield v. Municipality of Fajardo, 564 F.3d 40, 45 (1st Cir. 2009). Certain collateral orders are essentially "final decisions" and are therefore

-22-

immediately appealable under 28 U.S.C. § 1291. See Cohen v. Beneficial Indus. Loan Corp., 337 U.S. 541, 546 (1949). To fit within this collateral order doctrine, an order must "[1] conclusively determine the disputed question, [2] resolve an important issue completely separate from the merits of the action [the 'separability requirement'], and [3] be effectively unreviewable on appeal from a final judgment." P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 144 (1993) (quoting Coopers & Lybrand v. Livesay, 437 U.S. 463, 468 (1978)) (internal quotation mark omitted).

Because the "qualified immunity defense is, in part, an immunity from trial as well as an immunity from damage awards," a pre-trial denial of the defense may, in some cases, be immediately appealable. Stella v. Kelley, 63 F.3d 71, 73 (1st Cir. 1995); see Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). In Johnson v. Jones, 515 U.S. 304 (1995), the Supreme Court limited the circumstances in which a denial of qualified immunity is reviewable on an interlocutory basis. The Johnson Court held that a district court's conclusion that a summary judgment record in a qualified immunity case raised a genuine issue of fact as to whether the defendants were involved in the alleged events was not immediately appealable under the collateral order doctrine. 515 U.S. 313-18; see Plumhoff v. Rickard, ___ S. Ct. ___, 2014 WL 2178335, at *5 (2014).

-23-

*Johnson* relied in part on the "separability" requirement of the collateral order doctrine. The Court reasoned:

> Where . . . a defendant simply wants to appeal a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial, it will often prove difficult to find any such "separate" question -- one that is significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits.

*Id.* at 314. Questions of "evidentiary sufficiency" -- i.e., whether the record is capable of supporting a particular factual finding, rather than a particular legal conclusion -- "are not sufficiently distinct to warrant interlocutory appeal." *Mlodzinski v. Lewis*, 648 F.3d 24, 27 (1st Cir. 2011); *see* *also* *Stella*, 63 F.3d at 75 (holding that *Johnson* "permits immediate review of a qualified immunity claim when the issue appealed concerns not what facts the litigants might (or might not) be able to prove, but, rather, whether a given set of facts shows a violation of a federally protected right"). If appellate courts were to overlook this separability problem in the context of fact-based qualified immunity appeals and accept jurisdiction, those courts "may well be faced with approximately the same factual issue again, after trial," and interlocutory review would prove an unwise use of appellate resources. *Johnson*, 515 U.S. at 316-17; *see* *also* *Tang v. State of R.I., Dept. of Elderly Affairs*, 120 F.3d 325, 326 (1st Cir. 1997) ("*Johnson*'s limitation on immediate review rests

primarily on a prudential desire to avoid bringing evidentiary disputes to the appeals court except as part of a final judgment.").

In applying Johnson, we have said that "a summary judgment order which determines that the pretrial record sets forth a genuine issue of fact, as distinguished from an order that determines whether certain given facts demonstrate, under clearly established law, a violation of some federally protected right, is not reviewable on demand," at least so long as that perception is not infected by an error of law. Stella, 63 F.3d at 74 (emphasis added). It follows that a "district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact." Id. (citing Johnson, 515 U.S. at 318-20) (emphasis added).

So too here. The magistrate judge's opinion -- adopted in full by the district court -- denied summary judgment on the basis of the conclusion that there are genuine issues of fact and inference on the deliberate indifference claims against these three defendants. The opinion includes separate determinations as to each defendant, makes clear what portions of the record support those determinations, and outlines at length the permissible inferences that the magistrate judge believed a reasonable juror might draw from the evidence. Cf. Tang, 120 F.3d at 326-27

-25-

(holding that <u>Johnson</u> precluded interlocutory appeal even where the district court did not identify "specific factual issues or explain its ruling" and simply denied defendants' motion for summary judgment because it agreed that "the vast majority of the facts are in dispute").

Though the defendants urge us to view this appeal as presenting a pure issue of law (whether they are entitled to qualified immunity individually as a matter of law on the facts), they nowhere develop the argument that, even drawing all the inferences as the district court concluded a jury permissibly could, they are entitled to judgment as a matter of law.[7]  <u>Cf.</u> <u>Carter</u> v. <u>State of Rhode Island</u>, 68 F.3d 9, 12 (1st Cir. 1995) (holding that <u>Johnson</u> also applies to bar interlocutory review of district court's conclusions as to intent because resolving matters of intent "based on evidentiary proffers at summary judgment entails a quintessential <u>factual</u> assessment"); <u>Stella</u>, 63 F.3d at 75 ("[W]e lack the power to inquire into, or address, . . . the fact-based question of what the evidence does (or does not) show

---

[7]  The "purely legal" question of whether the qualified immunity defense is even available to Trueworthy, Walsh, and Williams is not necessarily dispositive here.  Even if we were to consider and decide the question of whether they are entitled to raise a qualified immunity defense, that decision would not, on its own, compel reversal of the denial of summary judgment in the defendants' favor, as the district court held that even if the defense were available, it fails at the summary judgment stage here.  <u>See</u> <u>Mlodzinski</u>, 648 F.3d at 27-28 (noting that an interest in avoiding advisory opinions was one factor motivating <u>Johnson</u>'s core holding).

concerning whether the [defendants'] actions violated the asserted right . . . .").

The defendants are correct that we have "assumed interlocutory appellate jurisdiction where defendants have accepted as true all facts and inferences proffered by plaintiffs, and [where] defendants argue that even on plaintiffs' best case, they are entitled to immunity." Mlodzinski, 648 F.3d at 28. And we may, consistent with Johnson, exercise review even where the defendants accept the plaintiffs' version only for the sake of argument. See 515 U.S. at 318; see also Berthiaume v. Caron, 142 F.3d 12, 16 (1st Cir. 1998) ("[A] defendant who concedes arguendo the facts found to be disputed is not barred by Johnson from taking an interlocutory appeal on a legal claim that the defendant is nevertheless entitled to qualified immunity on facts not controverted."). However, that formulation does not confer jurisdiction in this case. The defendants' briefing before us plainly disputes both the facts identified by the magistrate judge as well as the inferences proffered by the plaintiff and deemed reasonable by the magistrate judge.

With respect to each individual defendant, the defendants' briefing objects to the way the district court construed the facts and argues that the district court and magistrate judge erred in their conclusions as to what a reasonable juror could find. Those fact-based arguments are inextricably

intertwined with whatever "purely legal" contentions are contained in the defendants' briefs: were we to attempt to separate the legal from the factual in order to address only those arguments over which we might permissibly exercise jurisdiction, we simply would not know where to begin. Cf. Johnson, 515 U.S. at 318. It is not merely that the Statement of Facts in the defendants' brief, as in most briefs, shades the district court's determinations in a favorable manner. Such a tactic would, on its own, be insufficient to defeat jurisdiction. Rather, the defendants' brief repeatedly attacks the district court's factual conclusions, making no effort to separate fact-based arguments from "purely legal" ones.

For example, in its three-page section on Walsh's liability, the brief characterizes the district court's determinations as "unsupported in the record" and "conclusory," and argues that "[c]ontrary to the District Court's conclusion, the failure to send Galambos for emergency room care was based on the judgment of the nursing staff at the time that Galambos did not have any injury requiring hospital treatment." As the defendants acknowledge, this assertion runs directly counter to the district court's determination that

> [t]he record is sufficient to permit a reasonable finder of fact to conclude . . . that the failure to send Galambos out on December 8 likely related to the fact that he had been sent out on December 2 for the pencil wound and Walsh's insistence that loss of a nursing license was no good excuse for a send-out.

Cady, 2013 WL 3967486, at *28.  Such a fact-based challenge would, of course, not defeat jurisdiction if it were advanced in the alternative.  But nowhere in the defendants' brief does there appear any developed argument that the defendants are entitled to summary judgment even if the district court's conclusions about the record were correct.

Other such fact-based challenges abound.  Though the district court plainly determined that a reasonable factfinder could conclude that Williams knew of the risk to Galambos after the December 2 pencil-stabbing incident, the defendants' brief asserts that "[c]ontrary to the District Court's conclusion, an emergency transfer to a psychiatric facility was not, in . . . Williams' judgment, required until after the table jump."  There is no argument that Williams was not liable even if, as the district court concluded, she perceived such a risk.  Similarly, though the district court concluded that a reasonable jury could find that Trueworthy failed to address any issues with Galambos prior to discontinuing his medications, the defendants' brief characterizes that determination as "conclusory and unsupportable on the undisputed record," but nowhere argues that it is insufficient as a legal matter to support liability.  That issue, like the others we mention (and like many others raised in the defendants' brief) represents "the very type of factual dispute that Johnson holds to be premature so far as appellate review is concerned."  Tang, 120

F.3d at 326. Because the defendants' brief so clearly does not "accept[] as true all facts and inferences proffered" by the plaintiff, Mlodzinski, 648 F.3d at 28, we do not credit the defendants' assertion, in response to an earlier Order to Show Cause from this court, that they "accept the factual judgments made below."

Finally, the defendants' objection to the district court's analysis of whether the constitutional rights in play were "clearly established" also does not transform this appeal into one that turns on a pure issue of law. See Stella, 63 F.3d at 75 (concluding under Johnson that we can "examine the existence vel non of a constitutionally protected right" but not the fact-based question of what the evidence does or does not show). The defendants do not separate their qualified immunity arguments from their merits-based ones, and neither set of arguments concedes, even if only for the sake of argument, that the district court was correct in its determinations regarding what inferences were permissible on the summary judgment record. Because the defendants fail to pose even the qualified immunity question in a manner that would permit us to conclude that "the answer to it does not depend upon whose account of the facts is correct," see Stella, 63 F.3d at 75, we lack the authority to provide an answer.

This case fits squarely within Johnson, and we do not have jurisdiction to review it at this stage.

III.

This appeal is <u>dismissed</u> for want of appellate jurisdiction. <u>So ordered</u>.