# United States Court of Appeals
## For the First Circuit

No. 13-2309

CATHY PENN, in her capacity as Guardian of Matthew Lalli,

Plaintiff, Appellee,

v.

ANGELA ESCORSIO and DANE WINSLOW, individually and in their
official capacities as Knox County Corrections Officers,

Defendants, Appellants,

and

KNOX COUNTY; KNOX COUNTY SHERIFF'S DEPARTMENT; KNOX COUNTY JAIL;
DONNA DENNISON, in her official capacity as Knox County Sheriff;
and JULIE STILKEY, CHRISTOPHER TRUPPA, WARREN HEATH IV, ROBERT
WOOD, JOHN HINKLEY, KATHY CARVER, WARREN HEATH III, and BRADLEY
WOLL, individually and in their official capacities as Knox
County Corrections Officers,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. Nancy Torresen, U.S. District Judge]

Before
Thompson, Baldock,[*] and Selya,
Circuit Judges.

Peter T. Marchesi, with whom Cassandra S. Shaffer and Wheeler
& Arey, P.A. were on brief, for appellants.
Nolan L. Reichl, with whom Ralph I. Lancaster, Daniel J.
Stevens, Catherine R. Connors, and Pierce Atwood LLP were on brief,
for appellee.

---

[*]Of the Tenth Circuit, sitting by designation.

August 22, 2014

**Baldock, <u>Circuit Judge</u>**.  Defendants Dane Winslow and Angela Escorsio were involved in a series of troubling events that led to the attempted--and nearly completed--suicide of Matthew Lalli.  Lalli was at the time a pre-trial detainee being held at the jail where Defendants work as corrections officers.  Lalli's guardian, Plaintiff Cathy Penn, sued Defendants.  Penn claimed, among other things, deliberate indifference in violation of Lalli's Fourteenth Amendment Due Process rights.[1] Defendants moved for summary judgment, arguing they were not deliberately indifferent and, in any event, were entitled to qualified immunity.  The district court denied Defendants' motion.  The court held that, accepting all facts and drawing all inferences in Penn's favor, a reasonable jury could conclude Defendants were deliberately indifferent because they took essentially no action to forestall a substantial risk that Lalli would attempt suicide.  The court also held reasonable officials in Defendants' positions would have known they violated Lalli's clearly established Fourteenth Amendment rights if a jury indeed concluded that Defendants effectively failed to take <u>any</u> action to forestall this risk.

---

[1]  Penn originally sued a host of Defendants including Knox County, Knox County Sheriff's Department, Knox County Jail, Knox County's Sheriff, and a group of corrections officers including Defendants Winslow and Escorsio.  Penn sought money damages under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments to the United States Constitution, as well as under state law.  Ultimately, the parties settled and stipulated to the dismissal of all claims except those against Defendants Winslow and Escorsio.

Defendants now appeal, steadfastly asserting qualified immunity. But Defendants' appeal relies heavily on factual arguments despite our holding that "a district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or <u>an issue perceived by the trial court to be an issue of fact</u>." <u>Cady</u> v. <u>Walsh</u>, 753 F.3d 348, 359 (1st Cir. 2014) (emphasis in original) (internal quotation marks omitted). In particular, Defendants concede clearly established law at the time Lalli attempted suicide dictated officers must take <u>some</u> reasonable measures to thwart a known, substantial risk that a pre-trial detainee will attempt suicide. But the district court found a reasonable jury could conclude Defendants "effectively failed to take <u>any</u> action to forestall" this risk as to Lalli. Based on the conceded law and the district court's factual analysis, Defendants cannot show they are entitled to qualified immunity at the summary judgment phase of this litigation. Therefore, after winnowing away the chaff to reveal the very narrow legal question we may answer under 28 U.S.C. § 1291 and the collateral order doctrine, we affirm.

**I.**

We may exercise jurisdiction over an interlocutory appeal from a denial of summary judgment on qualified immunity only to the extent the appeal rests on legal, rather than factual grounds. We

thus summarize the facts in the light most favorable to Penn, taking as unchallenged any inferences the district court drew in her favor. <u>Cady</u>, 753 F.3d at 350.[2]  A more thorough recitation of these facts can be found in the district court's order, <u>see</u> <u>Penn</u> v. <u>Knox Cnty.</u>, No. 2:11-cv-00363, 2013 WL 5503671, at *1-13 (D. Me. Sept. 30, 2013) (unpublished), but the following will suffice for our purposes.

## A. Defendant Winslow

On Saturday, October 3, 2009, Matthew Lalli was arrested and taken to Knox County Jail ("KCJ") for allegedly being intoxicated and committing assault in violation of the terms of his release.  Lalli's arraignment on these charges was set for Monday, October 5.  When Lalli arrived at KCJ, Defendant Winslow was on duty as KCJ's shift supervisor.  In accordance with KCJ's intake procedures, Officer Stilkey, who was the booking officer under

---

[2]  Of course, "we need not accept [Penn's] version of events if it is 'blatantly contradicted' by the evidence." <u>Medina-Rivera</u> v. <u>MVM, Inc.</u>, 713 F.3d 132, 136 (1st Cir. 2013) (quoting <u>Scott</u> v. <u>Harris</u>, 550 U.S. 372, 380(2007)).  But Defendants nowhere argue the district court's factual determinations, as summarized below, are blatantly contradicted by the record and our review of the record reveals no blatant contradictions.  To be sure, Defendants argue that many of the district court's factual findings and inferences <u>are not supported</u> by the record, but that is a very different argument--an argument we do not have jurisdiction to review at this time.  <u>See</u> <u>Cady</u>, 753 F.3d at 359 ("Questions of 'evidentiary sufficiency'--i.e., whether the record is capable of supporting a particular factual finding, rather than a particular legal conclusion--are not sufficiently distinct to warrant interlocutory appeal." (marks and citations omitted)).

Winslow's supervision, filled out both a suicide risk assessment form and a medical screening form for Lalli. The suicide risk assessment revealed that Lalli had, among other things, (1) lost two close friends to suicide, (2) attempted suicide himself two years prior, and (3) when asked whether he then felt like killing himself responded "not sure, feels that . . . life is over." Under KCJ's model suicide risk assessment form, a suicide risk score of 15 or more points qualifies as the highest suicide risk level and requires KCJ to provide one-on-one observation of the inmate and to conduct a mental health evaluation within one hour. When Lalli's answers to the suicide assessment and medical screening forms are applied to this model, his risk of suicide scored at least 20 points. A final portion of the suicide risk assessment form calls for the booking officer to indicate with checkmarks which of five levels of intervention the detainee received ranging from "NO INTERVENTION/GENERAL POPULATION" to "PLACED ON SUICIDE WATCH STEP 2." Neither Stilkey nor Winslow checked off any of these boxes.

But Lalli's suicide risk assessment and medical assessment worried Officer Stilkey. As a result, after completing the forms, Stilkey told Defendant Winslow: "[Y]ou need to look at this." After reviewing Lalli's intake forms, Winslow decided to place Lalli on "welfare watch," which required staff to make separate log entries regarding Lalli's condition when they conducted their fifteen-minute checks of his cell and ensured that

a mental health care worker would speak with Lalli the next time one was scheduled to visit the jail. Although KCJ had an available suicide prevention cell, Cell 127, which could be constantly monitored from the intake desk, Winslow decided to place Lalli in Cell 135. Officers sitting at the intake desk can hear people in Cell 135 if they make a loud noise, but have no view into Cell 135 itself. Moreover, Cell 135 is not stripped of objects a detainee could use to harm himself. For instance, Cell 135 contains sheets and bedding which a detainee could potentially fashion into a makeshift noose--as Lalli did here. Winslow had no further notable contact with Lalli and Sunday, October 4 was uneventful.

## B. Defendant Escorsio

On the morning of Monday, October 5, Officer Heath, who was at that time the on-duty intake officer, documented in KCJ's intake/release log and in Lalli's welfare-watch log that: "while moving inmate Wood, inmate Matthew Lalli told me that he has sole custody of his daughter and that if he were not allowed to be on the outside then it would be better if he wasn't alive at all." At 12:07 p.m., KCJ's intake/release log indicates Defendant Escorsio took over for Heath as intake officer.

Between noon and 12:30 p.m., jail staff assembled nine detainees in the intake area to prepare them for their trip to the Knox County District Court for court appearances. The group included Lalli and several other inmates who were deposed in

relation to this suit. One inmate testified that Lalli began "really freaking out" before being loaded into a van for transport to the court--apparently loud enough for Defendant Escorsio to have heard. Another inmate testified that Lalli made various threats to hurt himself during the trip from the jail to the courthouse, saying "if I don't get the hell out of here I'm going to hurt myself, kill myself."

At his arraignment, Lalli told the presiding judge that "it would be all be over" and that he would "just end it" if he was denied bail. The judge nevertheless ordered that Lalli be held without bail. After the judge issued the ruling, Lalli became upset and started crying. As Lalli returned to the dock area, one witness testified, he was "screaming hysterically and crying and threatening suicide." This witness recalled that after Lalli rejoined the other inmates, he said that he "might as well just kill himself because he [couldn't] go back to jail" and that he was "going to lose everything." Another inmate in the van testified that Lalli, loudly and throughout the short trip back to jail, "kept saying he was going to kill himself."

Although none of the transport officers relayed Lalli's suicide threats to Defendant Escorsio, the district court found "one of the inmates [probably] did inform Escorsio." At approximately 2:52 p.m., a corrections officer strip-searched Lalli. Lalli was upset after the search and began to cry. Hoping

to calm Lalli down, Escorsio allowed him to make a call from the phone next to the jail's intake desk. As the call began, Escorsio heard Lalli speak about his daughter and the denial of his bail. Corporal Woll, who was also nearby, heard Lalli say that he would rather die if he did not have his daughter.

At this point, Defendant Escorsio and the other officers on duty decided Lalli should be moved from Cell 135 to Cell 127, the vacant suicide prevention cell. But because a female inmate occupied Cell 126, which shares a day room with Cell 127, the officers needed to move some inmates around before putting Lalli in Cell 127. Instead of taking any precautions in the interim, however, at about 3:00 p.m. Escorsio returned Lalli to Cell 135. She did not put him in a suicide smock, nor did she take away his bedding. Escorsio then secured Lalli's two neighboring inmates in their cells, allowing only Lalli access to the adjoining day room. Before she left the area, Escorsio told Lalli to "sit down" and "shut up" and warned him that she would bring him "up front in the turtle suit [a.k.a. suicide smock]" if he did not do as told.

Next, Lalli made a call from the phone in the day room. Lalli told the person on the other end of the line that he was going to kill himself. According to the district court, Lalli then began pacing around the day room, screaming "I'm going to f***ing kill myself" as loud as if he were "hollering to somebody 75 yards away." After spending about ten to fifteen minutes in the day

room, Lalli went into Cell 135 and closed the door. Once inside, Lalli started kicking his door, throwing things around his cell and creating a lot of commotion. Defendant Escorsio conducted another welfare check on Lalli sometime between 3:15 and 3:25 p.m. Lalli stopped making noise after this visit.

Just before 3:30 p.m., Defendant Escorsio asked Corporal Woll to perform Lalli's upcoming welfare-watch check for her. Before Woll reached Cell 135, however, he noticed a white sheet hanging from a divider pole. Woll immediately ordered the door be opened and called for assistance. Once inside, he found Lalli's body hanging from the divider pole. Woll and another corrections officer began performing chest compressions and CPR on Lalli. Before long, paramedics arrived and removed Lalli from the cell. An ambulance rushed Lalli to Eastern Maine Medical Center, in Bangor, Maine, where doctors later diagnosed him with anoxic brain injury resulting from the suicide attempt.

### C. The District Court Order

In analyzing the deliberate indifference claim against Defendant Winslow, the district court found, "[a] reasonable jury could conclude that requiring guards to record their observations in a welfare watch logbook has no practical effect and serves only to paper the jail's file," Penn, 2013 WL 5503671 at *18, and that under "welfare watch" Lalli "was monitored no more than any other pretrial detainee in the jail's intake wing." Id. at *19. The

-10-

court also pointed out that Winslow put Lalli in one of the least-observable cells in the intake wing, and no mental health care worker visited the jail's premises until Tuesday, October 6, three days after Lalli arrived at KCJ and a day after Lalli attempted suicide. The court did note that "Winslow's involvement in Lalli's case was almost two days removed from Lalli's suicide attempt," but pointed out that "this fact alone does not preclude liability" because a reasonable jury could find that "[t]he decisions [Winslow] made about Lalli's housing and monitoring regime set a baseline which affected how everyone else at the jail interacted with Lalli."

Ultimately, the district court determined a reasonable jury could find Defendant Winslow acted with deliberate indifference toward Lalli:

> Taking the facts in the light most favorable to the Plaintiff and drawing all inferences in her favor, a fact-finder could conclude that Sergeant Winslow took <u>essentially no action</u> to reduce the substantial risk that Lalli would attempt to kill himself . . . . Under this view of the facts, this is not a case where Sergeant Winslow merely chose between different "course[s] of treatment," but rather one where he failed to provide any meaningful help at all. Accordingly, there is a triable issue of fact regarding whether Sergeant Winslow "culpably ignore[d]" a substantial risk that Lalli would seriously harm himself.

Id. (emphasis added).

In analyzing the deliberate indifference claim against Defendant Escorsio, the district court found "[t]here is a genuine dispute of material fact regarding whether Officer Escorsio

-11-

realized that Lalli faced a substantial risk of serious harm on the afternoon of October 5, 2009." Id. at *24. The court also pointed out that "a reasonable fact-finder could conclude" Escorsio did not check on Lalli at the mandated 15-minute intervals, and that she "conducted only a cursory check, 'holler[ing]' into Lalli's cell from outside that he needed to 'quiet down' but never actually entering his cell or directly observing him." Id. Furthermore, the court found, "[a] reasonable fact finder could conclude that Officer Escorsio's commands to 'sit down' and 'shut up,' and threats of a 'turtle suit' worsened Lalli's fragile condition." Id. As such, the court concluded, "[s]ince Officer Escorsio took essentially no action to protect Lalli after he returned to Cell 135, there is a triable issue regarding whether Officer Escorsio 'culpably ignor[ed]' a substantial risk that serious harm would befall Lalli," and therefore could be found liable for deliberate indifference. Id. (emphasis added).

As to Defendants' claim of qualified immunity, the district court first held that, "[w]ith respect to [Defendants] Winslow . . . and Escorsio, 'the facts alleged or shown by the plaintiff make out a violation of a constitutional right.'" Id. at *26 (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). The court then addressed whether the right was clearly established. The court explained that "as a general matter, a reasonable official in the Defendants' position in October of 2009

-12-

would have known that it violates the Fourteenth Amendment to fail to take reasonable measures to thwart a known, substantial risk that a pretrial detainee will attempt suicide." Id. at *26. The court also noted that under clearly established law "a plaintiff may make out a deliberate indifference claim by showing that an official failed to communicate critical information about a specific, serious risk facing an inmate where it was within the official's scope of responsibility to do so." Id. Applying this law to the summary judgment record, the court held:

> Defendants' alleged conduct--effectively failing to take any action to forestall the risk that Lalli would attempt suicide at the moment he did--clearly falls under the "general constitutional rule" that it violates the Fourteenth Amendment to fail to take reasonable measures to thwart a known, substantial risk that a pretrial detainee will attempt suicide.

Id. (emphasis in original). Accordingly, the court held Defendants were not entitled to qualified immunity on the claim of deliberate indifference at the summary judgment stage. Defendants timely appealed.

## II.

Our first task is to establish the contours of our jurisdiction over this appeal.

> An order denying a motion for summary judgment is generally not a final decision within the meaning of [42 U.S.C.] § 1291 and is thus generally not immediately appealable. But that general rule does not apply when the summary judgment motion is based on a claim of qualified immunity. Qualified immunity is an immunity from suit rather than a mere defense to liability. As a result, pretrial orders denying qualified immunity

-13-

generally fall within the collateral order doctrine. This is so because such orders conclusively determine whether the defendant is entitled to immunity from suit; this immunity issue is both important and completely separate from the merits of the action, and this question could not be effectively reviewed on appeal from a final judgment because by that time the immunity from standing trial will have been irretrievably lost.

Plumhoff v. Rickard, 134 S. Ct. 2012, 2018–19 (2014) (quotations and alterations omitted).

That said, we have long relied on Johnson v. Jones, 515 U.S. 304, 318–20 (1995), for the proposition that: "a 'district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact.'" Cady, 753 F.3d at 359 (emphasis in original) (quoting Stella v. Kelley, 63 F.3d 71, 74 (1st Cir. 1995), and citing Johnson, 515 U.S. at 318-20).

But the Supreme Court recently clarified that "the Johnson order was not immediately appealable because it merely decided a question of 'evidence sufficiency,' i.e., which facts a party may, or may not, be able to prove at trial." Plumhoff, 134 S. Ct. at 2019. On the other hand, the Court explained, to the extent officers "contend that their conduct did not violate the [law] and, in any event, did not violate clearly established law. . . . they raise legal issues." Id. The Court then made clear that "deciding legal issues of this sort is a core responsibility

of appellate courts, and requiring appellate courts to decide such issues is not an undue burden." Id.

In sum, we "need not consider the correctness of the plaintiff's version of the facts," Mitchell v. Forsyth, 472 U.S. 511, 528 (1985), except, perhaps, to the extent they are "blatantly contradicted by the record," Scott, 550 U.S. at 380.[3] But, assuming those plaintiff-friendly facts and inferences not blatantly contradicted by the record, we cannot shirk our duty to decide as a matter of law whether Defendants, on those assumed facts, violated the law and whether that law was clearly established such that Defendants are not entitled to qualified immunity.

Before we reach this purely legal question, however, we must peel away the facade by which Defendants persistently portray as legal arguments what are in reality purely factual disputes. "Qualified immunity protects public officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Elliott v. Cheshire Cnty., N.H., 940 F.2d 7, 10 (1st Cir. 1991) (marks and citations omitted). Defendants do indeed assert (1) they did not violate Lalli's rights, or at least (2) a reasonable officer in their position would not have known he was violating Lalli's clearly established

---

[3] See supra note 2.

-15-

rights.  But their arguments to support these assertions are entirely factual and thus not appropriate for interlocutory appeal.

**A.**

Take for example Defendants' argument that they did not violate Lalli's rights by deliberate indifference.  "It is clearly established . . . that jail officials violate the due process rights of their detainees if they exhibit a deliberate indifference to the medical needs of the detainees . . . ."  Id.  "To demonstrate deliberate indifference a plaintiff must show (1) a grave risk of harm, (2) the defendant's actual or constructive knowledge of that risk, and (3) his failure to take easily available measures to address the risk."  Camilo-Robles v. Hoyos, 151 F.3d 1, 7 (1st Cir. 1998).

> Deliberate indifference is more than negligence.  In a suicide case, a finding of deliberate indifference requires a strong likelihood, rather than a mere possibility, that self-infliction of harm will occur. The conduct must encompass acts or omissions so dangerous (in respect to health and safety) that a defendant's knowledge of a large risk can be inferred.  When a supervisory official is placed on actual notice of a prisoner's need for physical protection or medical care, administrative negligence can rise to the level of deliberate indifference to or reckless disregard for that prisoner's safety.

Elliott, 940 F.2d at 10.

Defendants do not dispute the district court's recitation of the law as to deliberate indifference.  Rather, Defendant Winslow argues he was not deliberately indifferent, and therefore did not violate Lalli's rights because "the summary judgment record

-16-

does not support finding a genuine issue as to whether Winslow actually knew of the risk [that Lalli would attempt suicide] or whether Winslow was deliberately indifferent to that risk." Defs.' Br. at 26. Similarly, Defendant Escorsio argues she "was not deliberately indifferent to Lalli's Fourteenth Amendment rights because she took some action to avert the risk of harm." Id. at 50. But these discussions "nowhere develop the argument that, even drawing all the inferences as the district court concluded a jury permissibly could, they are entitled to judgment as a matter of law." Cady, 753 F.3d at 359-60. Instead, Winslow's arguments take issue with the district court's factual determinations as to his knowledge of risk and his efforts--or lack thereof--to abate that risk.[4] Similarly, Escorsio's arguments dispute the court's factual finding that she may have taken essentially no action to avert the risk Lalli would attempt suicide when she returned him to Cell 135.

As we recently stated in Cady, these "fact-based challenge[s] would, of course, not defeat jurisdiction if . . . advanced in the alternative. But nowhere in the defendants' brief does there appear any developed argument that the defendants are entitled to summary judgment even if the district court's

---

[4] Winslow also raises a causation argument, but this argument is based on a dispute with the district court's finding of a factual issue as to whether "[t]he other corrections officers who encountered Lalli may have been lulled to complacency by the fact that the official charged with reviewing Lalli's intake file decided he merited only welfare watch treatment." Defs.' Br. at 38 (quoting Penn, 2013 WL 5503671, at *19).

-17-

conclusions about the record were correct." Id. at 361. As such, we have no basis on which to exercise jurisdiction over whether Defendants violated Lalli's clearly established rights through deliberate indifference to the risk that he would attempt suicide.

**B.**

Similarly, Defendants' arguments as to whether officials in their positions could have reasonably believed their actions were lawful "do not transform this appeal into one that turns on a pure issue of law." Cady, 753 F.3d at 361. Indeed, Defendants' arguments on this point are, again, purely factual.

For example, the district court stated that "[a]s of October 3, 2009, it had long been settled law that state jail officials violate the Due Process Clause of the Fourteenth Amendment when they act with deliberate indifference toward the risk that pretrial detainees will seriously harm themselves while in state custody." Penn, 2013 WL 5503671, at *26. The court also stated that "an official violates [clearly established law] if he knows that a pretrial detainee faces a substantial risk of serious harm but disregards that risk by failing to take reasonable measures to abate it." Id. Defendants do not dispute these statements of the law and we will not review them now as Defendants waived any argument to the contrary. Indeed, Defendants' brief affirmatively asserts the district court's recitation of clearly established law is correct. See, e.g., Defs.' Br. at 44; see also

Defs.' Reply at 28 (quoting Rellergert by Rellergert v. Cape Girardeau Cnty., Mo., 924 F.2d 794, 797 (8th Cir. 1991), for the proposition that "the law is clearly established that jailers must take [some] measures to prevent inmate suicides once they know of the suicide risk, [but] we cannot say that the law is established with any clarity as to what those measures must be").

Instead, Defendant Winslow, for his part, contends "[t]here is nothing about this broad, general proposition that would have alerted [him] that" placing Lalli on "welfare watch" would violate Lalli's constitutional rights. Defs.' Br. at 45. Winslow thus argues he "is entitled to qualified immunity because he took some action to abate the risk Lalli presented." Id. at 48 (emphasis added). But this argument is premised on a fundamental factual dispute: Winslow believes the record shows he took "some action" to abate the risk Lalli would attempt suicide by placing him on "welfare watch," while the district court found factual issues from which "[a] reasonable jury could conclude that [placing Lalli on 'welfare watch'] did nothing" to reduce the risk of Lalli attempting suicide between the time he arrived at KCJ and the time he made his suicide attempt.[5] Penn, 2013 WL 5503671, at *18.

---

[5] Defendant Winslow repeatedly contends that placing Lalli on "welfare watch" resulted in his being observed at least twice as often as an inmate placed in KCJ's general population. But he fails to cite anywhere in the record to establish that, but for his being placed on "welfare watch," Lalli would have indeed been placed in the general population before he attempted suicide.

Indeed, the district court stated, "[u]nder this view of the facts, this is not a case where Sergeant Winslow merely chose between different courses of treatment, but rather one where he failed to provide any meaningful help at all."  Id. at *19 (emphasis added) (internal quotation marks omitted).  Winslow's argument that he acted reasonably because he took "some action" is thus a purely factual dispute with the district court's factual determinations--a dispute we have no jurisdiction to pass on at this point in the litigation.[6]

Defendant Escorsio raises essentially the same argument on this point.  She, like Defendant Winslow, reaffirms the district court's statement as to the applicable clearly established law.  She then, argues, however, that "[e]xisting case law does not place correctional officers on notice that taking some action, but not enough action, to forestall or prevent harm [violates] inmates' Fourteenth Amendment rights."  Defs.' Br. at 60 (emphasis added).  Like Winslow, the thrust of Escorsio's argument is that she took "some action" to prevent Lalli from attempting suicide.  She therefore simply disputes the district court's factual finding that

---

[6]  Winslow likewise concedes clearly established law required him to communicate critical information about any specific serious risk facing Lalli, but contends that he did communicate this information by establishing the watch log. Defs.' Br. at 48.  This argument assumes future officers would read the watch log when the district court found "[t]here is no evidence that any jail official was charged with reading or analyzing the welfare watch logbook." Penn, 2013 WL 5503671, at *18.  Accordingly, this is but another purely factual argument that we may not resolve at this time.

a reasonable jury could conclude she took "effectively no action" to prevent or forestall this risk. And, as with Winslow, we cannot resolve this factual dispute at this point in the litigation.

Ultimately, Defendants hang their hat on disagreements with how the district court weighed the evidence as to whether they in fact took any action that might have actually forestalled a substantial risk that Lalli would attempt suicide. As important as this issue may be, we do not have jurisdiction to address it on interlocutory appeal as it turns on questions of evidentiary sufficiency. See Cady, 753 F.3d at 359.

## III.

Having stripped Defendants' arguments of all factual disputes, we find relatively straightforward the purely legal question whether, for summary judgment purposes, Defendants' conduct "did not violate the [law] and, in any event, did not violate clearly established law." Plumhoff, 134 S. Ct. at 2019. As to the applicable clearly established law, we accept for purposes of this appeal Defendants' concession that "an official violates [clearly established law] if he knows that a pretrial detainee faces a substantial risk of serious harm but disregards that risk by failing to take reasonable measures to abate it." Defs.' Br. at 44 (quoting Penn, 2013 WL 5503671 at *26). We also accept Defendant Winslow's concession that clearly established law required him to communicate critical information about any specific

-21-

serious risk facing Lalli. Id. at 48 (citing Penn, 2013 WL 5503671 at *26). As to the applicable facts and inferences, construed in the light most favorable to Penn, the district court found that a reasonable jury could conclude Defendants "faced . . . knowledge of a substantial risk to Lalli," and "effectively failed to take any action to forestall the risk that Lalli would attempt suicide at the moment he did." Penn, 2013 WL 5503671 at *26 (emphasis in original).

In sum, Defendants concede that clearly established law dictated they take some action to abate a known risk, whereas the district court found a jury could conclude Defendants took effectively no action to abate a known risk. As such, on the purely legal question of qualified immunity here, we affirm. Indeed, we find our closing remarks from Camilo-Robles especially apropos:

> Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law. In this case, none of the appellants consciously chose to violate the law. If the assumed facts indicated that they were merely inattentive or careless, then qualified immunity would shield them despite the fact that [they] violated [an inmates's] clearly established rights. Here, however, indulging reasonable pro-plaintiff inferences, the record shows conduct on the appellants' part that can best be described as reckless and wanton-- conduct that is emblematic of . . . plain incompetency . . . . The appellants' behavior is, therefore, outside the wide band of mistaken police judgments that the qualified immunity doctrine is intended to shield and the appellants . . . are not entitled to summary judgment.

Camilo-Robles, 151 F.3d at 15.

**IV.**

Before we close, a caveat. This opinion should not be construed as holding Defendants are totally ineligible for qualified immunity. Depending on what Defendants can prove at trial, they may indeed be entitled to raise qualified immunity as an affirmative defense. Compare Plumhoff, 134 S. Ct. at 2019 ("[Q]ualified immunity is 'an immunity from suit rather than a mere defense to liability.'" (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009)), with Ortiz v. Jordan, 131 S. Ct. 884, 889 (2011) ("A qualified immunity defense . . . does not vanish when a district court declines to rule on the plea summarily. The plea remains available to the defending officials at trial . . . ."), and Camilo-Robles, 151 F.3d at 9 ("When a defendant fails on a pretrial qualified immunity claim, he nonetheless can plead qualified immunity as an affirmative defense and resurrect the claim at trial."). Rather, we simply hold that, on the clearly established law conceded by Defendants themselves and the reasonable pro-plaintiff inferences drawn by the district court below, Defendants are not entitled to qualified immunity at the summary judgment phase.

This appeal is therefore DISMISSED in part for want of appellate jurisdiction and, to the extent jurisdiction exists, the judgment below is AFFIRMED. Costs in favor of plaintiff-appellee Penn.