# United States Court of Appeals
## For the First Circuit

No. 13-2278

ROBERT GOGUEN,

Plaintiff, Appellee,

v.

DAVID ALLEN, JESSICA ALMEIDA, DARLENE BUGBEE, JAMES FRENCH,
EDDIE JACQUES, JENNIFER GILBLAIR, MARGARET KELLY, CRAIG MEUNIER,
KEITH PLOURD, MICHAEL RIZZO,

Defendants, Appellants,

COREY SWOPE, SHAWN MAGUIRE, GARY CRAFTS, THERESA BROWN,
JULIE HAYDEN, JEFFREY JACQUES,

Defendants.

————————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE
[Hon. John A. Woodcock, Jr., U.S. District Judge]

————————————

Before
Lynch, Chief Judge,
Ripple* and Selya, Circuit Judges.

————————————

Peter T. Marchesi, with whom Cassandra S. Shaffer and
Wheeler & Arey, P.A., were on brief, for appellants.
Michael J. Waxman for appellee.

————————————

* Of the Seventh Circuit, sitting by designation.

March 12, 2015

**RIPPLE, Circuit Judge**. Robert Goguen is a former pretrial detainee at the Somerset County Jail ("SCJ"). He brought this action alleging that various correctional officers at SCJ violated his rights under the First, Eighth, and Fourteenth Amendments by inflicting punishment on him without due process of law and by retaliating against him for filing grievances against members of SCJ's staff. The defendant officers and administrators moved for judgment on the pleadings, summary judgment on the merits, and also summary judgment on the basis of qualified immunity. The district court granted summary judgment to several defendants who had not participated personally in the alleged violations. With respect to the remaining defendants, the court concluded that there were genuine issues of material fact concerning the defendants' actions and motivations that precluded summary judgment. These remaining defendants timely appealed.

We conclude that the defendants' appeal must be dismissed for want of appellate jurisdiction. The defendants' arguments on appeal take issue with the district court's factual assessments and do not present a pure issue of law for this court's consideration. Consequently, following our holdings in Cady v. Walsh, 753 F.3d 348 (1st Cir. 2014), and Penn v.

<u>Escorsio</u>, 764 F.3d 102 (1st Cir. 2014), we cannot entertain the defendants' appeal.

**I.**

**A.**

Between March and December 2011, Mr. Goguen was detained at the SCJ awaiting his trial on pending charges in state and federal courts. From March 15, 2011, until June 23, 2011, the SCJ housed Mr. Goguen in its E-pod, a general population area in which inmates are allowed some freedom of movement. In contrast, SCJ's A-pod, which houses inmates in administrative segregation, inmates in disciplinary segregation, and inmates who are classified as maximum security, imposes significantly greater restrictions. Mr. Goguen's allegations center on his repeated placement in A-pod, ostensibly for administrative segregation. We therefore discuss, in some detail, the conditions of confinement in A-pod.

Inmates in administrative segregation endure a significantly restrictive environment. While in administrative segregation, inmates are allowed out of their cells for one hour per day, five days per week, for recreation. "Recreation" takes place in a caged area that is approximately five feet wide by ten feet long. Inmates in administrative segregation leave

-4-

their cells to shower three times per week; each inmate generally is allowed ten to fifteen minutes to shower. Once a week, inmates in administrative segregation are allowed out of their cells to make a telephone call.

According to the defendants, any inmate housed in A-pod, whether placed there for administrative segregation, for disciplinary segregation, or because of their maximum-security classification, are strip searched every time they enter or leave their cells. All cells in A-pod are searched at least once per day, compared to cells in E-pod, which are searched on a monthly basis. Additional cell searches also may be conducted when SCJ staff members receive information that an inmate possesses contraband. When a cell search is conducted, the inmate housed in that cell is strip searched prior to being removed from the cell.

When an inmate is taken to administrative segregation, all of the inmate's property is put into a bag and taken to the property room. If an inmate in administrative segregation requests his legal materials, arrangements are made to provide the legal materials to the inmate when the property officer is on duty. When an inmate is placed back in general population, the inmate's property is returned by the property officer.

Placement in administrative segregation is reviewed within seventy-two hours by the classification supervisor. SCJ policy also requires that, within the same time frame, an inmate be given notice of the reason for his placement in administrative segregation and of the date and time that the committee will hold a hearing to review the administrative-segregation placement. Another review of administrative-segregation status is done within seven days (every Friday) to determine if continued placement is needed; review can be performed by any day shift commander.

### 1. June 23 Disciplinary Charges

The incidents relevant to Mr. Goguen's claims begin on June 23, 2011, when Officer Jennifer Gilblair searched Mr. Goguen's cell in E-pod for an envelope. Officer Gilblair asked Officer Craig Meunier not to let Mr. Goguen upstairs while she was searching the cell. Mr. Goguen was allowed to watch the cell search from downstairs. Based on the configuration of the SCJ, however, the district court concluded that one actually cannot watch a cell search from downstairs. The defendants dispute whether the district court reasonably could have reached this conclusion based on the evidence before it. Officer Gilblair's search uncovered commissary items including one

-6-

plastic soap dish, one bar of soap, one plastic bowl, one white-colored shower shaver, and one bottle of shampoo. It is undisputed that, due to a lack of funds, Mr. Goguen could not have purchased these items; consequently, Officer Gilblair wrote a disciplinary report and a notice of infraction for a violation of C-04 of the SCJ Inmate Discipline Policy, "Giving, Receiving, or Swapping."[1] Mr. Goguen maintains that there was no legitimate reason to search his cell for an envelope because legal envelopes are supplied for free by the commissary.

According to Officer Meunier, Mr. Goguen responded to the search of his cell by arguing and swearing at him. Officer Meunier therefore wrote a disciplinary report concerning Mr. Goguen's conduct, in which he charged Mr. Goguen with a violation of B-24, "Interfering," and B-12, "[P]rovocation."[2] Mr. Goguen denies that he argued with or swore at the officers involved in the search of his cell; instead, he maintains that Officer Gilblair yelled and cursed at him. Mr. Goguen contends that these charges were falsely brought by Officers Meunier and

---

[1] See R. 56-11 (SCJ Policy-"Inmate Discipline") at 72; R.45-18 (SCJ Disciplinary Report dated 6/23/11) at 1.

[2] R.45-20 (SCJ Disciplinary Report dated 6/23/11) at 1. Although the disciplinary report identifies "Provocation" as a violation of policy "B-12," "Provocation" actually corresponds to B-13. R.56-11 (SCJ Policy-"Inmate Discipline") at 71.

Gilblair. Notably, Mr. Goguen attributes Officer Gilblair's actions to the fact that, just before the search, he had been a witness for another inmate and "wrote a report against Gilblair for her misconduct . . . or harassment."[3] Following this incident, Mr. Goguen was placed in administrative segregation in A-pod on order of then-Sergeant Keith Plourd.[4]

A non-defendant officer, Officer Ducharme, was assigned to investigate the giving-receiving-swapping charge and spoke to Mr. Goguen on the day of the incident. He informed Mr. Goguen of the alleged violation and asked for Mr. Goguen's side of the story. Officer Ducharme provided Mr. Goguen a notice of infraction, which informed him of the charge. Mr. Goguen admitted that the items found in his cell were not issued to him, but claimed that they either were left in the cell, given to him by another inmate, or left behind in the shower; he claimed that he was unaware that he could not have them.

---

[3] R.83 (Goguen Dep.) at 47.

[4] Sergeant Plourd now has been promoted to Lieutenant. However, we shall refer to him by his rank at the time the alleged actions took place.

Mr. Goguen maintains that, as a result of the search conducted on June 23 and his subsequent transfer to A-pod, some of his legal papers went missing. He has not substantiated this allegation through any sworn statement.

Officer James French was assigned to investigate the interfering-provocation charge. He supplied Mr. Goguen with a notice, informed Mr. Goguen of the charge, and asked for his side of the story.

The standard notice informs inmates that they will receive an opportunity to respond or to explain the alleged violation to a disciplinary hearing officer within seven days; the hearing officer considers whether the inmate is guilty and determines the appropriate sanction. The notice further states that the inmate has the right to call witnesses and to question them, provided the witnesses are identified and the questions are presented to the hearing officer prior to the hearing date.

Notices and reports of infractions are forwarded to Special Projects Officer Gary Crafts. Officer Crafts reviews each matter and then determines how the charge should proceed. For instance, he may determine that the charge should be changed, dismissed, or steered toward an informal resolution. He also may refer the matter for further investigation or for a disciplinary hearing. Officer Crafts referred both of Mr. Goguen's June 23 infractions for disciplinary hearings. Mr. Goguen identified his witnesses by description and cell location, but not by name. He also did not put in writing the

questions that he wanted witnesses to answer. As a result, neither Officer Crafts, nor the hearing officer, pursued any witness statements on Mr. Goguen's behalf.

A hearing was conducted on July 1 by Officer Eddie Jacques. At the hearing, Officer Jacques heard Mr. Goguen's testimony, viewed still photos, reviewed the officers' incident reports, and found Mr. Goguen guilty of "Giving, Receiving, or Swapping," for which he received a verbal reprimand. Officer Jacques also found Mr. Goguen guilty of "Interfering" and "Provocation," for which he received a verbal reprimand and a $10 fine. Officer Eddie Jacques stated in his reports that he had assessed zero days of disciplinary segregation. Mr. Goguen appealed the decision concerning interfering and provocation to the administrator of SCJ, Major David Allen, but the decision was affirmed.

While these proceedings were ongoing, Mr. Goguen stayed in A-pod. His placement first was reviewed by non-defendant Lieutenant Campbell on June 26, 2011. Lieutenant Campbell determined that Mr. Goguen should remain in administrative segregation, and Mr. Goguen received a notice that he would be kept in administrative segregation and his placement again would be reviewed on July 1, 2011.

-10-

On July 1, 2011, a hearing was held to review Mr. Goguen's administrative-segregation status. Lieutenant Darlene Bugbee was the hearing officer, and Officer French and non-defendant Officer Welsh served as committee members. Mr. Goguen attended and testified at the hearing, after which the committee determined that Mr. Goguen should remain in administrative segregation until a classification committee could review his security status.

On July 6, 2011, another administrative segregation hearing occurred. This time, Lieutenant Bugbee was the hearing officer; Sergeant Plourd and Officer Meunier served as committee members. Following the hearing, at which Mr. Goguen testified, the committee determined that he should be removed from administrative segregation because classification had reviewed Mr. Goguen's status and had determined that he still should be classified as a medium-security inmate. Mr. Goguen therefore was released from administrative segregation and returned to E-pod, where he remained until he was transported to the Penobscot County Jail on July 10, 2011.

### 2. July 15, 2011 Incident

After Mr. Goguen returned to SCJ, Mr. Goguen again was placed in A-pod on July 15, 2011, as a result of a dispute

-11-

concerning his bunk assignment. During cell reassignments, Mr. Goguen was assigned an upper bunk. Mr. Goguen, however, told Officer Michael Rizzo that he needed a lower bunk. When Officer Rizzo inquired of the medical department whether Mr. Goguen had a bottom-bunk restriction, the medical department responded that he did not. The parties give vastly different accounts of the events that followed. According to the defendants,[5] Officer Rizzo ordered Mr. Goguen to move to the upper bunk, but Mr. Goguen refused and told Officer Rizzo to send him to A-pod, which Officer Rizzo did. Officer Rizzo also wrote a disciplinary report and a notice of infraction for a violation of B-11, "Order, Refusing to obey."[6] In his deposition, Mr. Goguen denied that he had been ordered to take an upper bunk; he testified that, after Officer Rizzo called the medical department and discovered that Mr. Goguen did not have a medical restriction for a lower bunk, Officer Rizzo "slammed [him] against the wall," handcuffed him, and escorted him to A-pod.[7] The B-11 infraction eventually was dismissed.

---

[5] The defendants' version is set forth in their brief. See Appellants' Br. 27–28.

[6] R.56-11 (SCJ Policy–"Inmate Discipline") at 71.

[7] R.83 (Goguen Dep.) at 58–59.

Mr. Goguen's placement in administrative segregation was reviewed by Lieutenant Campbell on July 18, 2011. He determined that Mr. Goguen should remain in administrative segregation. Mr. Goguen received notice of the decision and notice that his placement would be reviewed on July 22, 2011. On July 22, 2011, a hearing was held to review Mr. Goguen's administrative segregation status; Lieutenant Campbell served as the hearing officer, and non-defendant Officers Jewell and Madore served as committee members. At the hearing, Mr. Goguen did not dispute that he told Officer Rizzo that he should be taken to A-pod if he was not going to be assigned a lower bunk; he does dispute that he was disruptive, that he argued, and that he refused an order, which were the bases for his transfer to A-pod.[8] The hearing committee determined that Mr. Goguen should remain in administrative segregation because of his habit of "arguing, wanting [his] own way, [and being] non-cooperative."[9] On July 28, Mr. Goguen was removed from administrative

---

[8] See R.56-3 (Administrative Segregation Status Placement dated 7/15/11) at 14 ("Inmate Robert Goguen placed on Ad Seg for disrupting the pod during cell moves. Inmate Goguen argued with the pod officer during cell moves.").

[9] Id.

-13-

segregation and moved back to E-pod because he was "[r]eady to follow orders" and was placed in an upper bunk.[10]

Shortly after Mr. Goguen returned to E-pod, Officer Rizzo approached Mr. Goguen and stated: "'I will make sure that you do not come back to this block. I will do whatever it takes in my personal power to make sure you spend the rest of your time in A[-]pod. I don't care who I have to talk to.'"[11]

### 3. August 31/September 1, 2011 Incidents

On August 31, 2011, Mr. Goguen was on a telephone call with a federal magistrate judge about another lawsuit. Major Allen interrupted the call and insisted that Mr. Goguen hang up the telephone. When Mr. Goguen tried to explain that he was on the telephone with a federal magistrate judge, Major Allen "took the phone from [Mr. Goguen's] hand, hung the phone up, told [Mr. Goguen] to put [his] hands behind [his] back, [and] [Mr. Goguen] was handcuffed, shackled and escorted to A[-]pod."[12] Once there, Major Allen informed him that he (Mr. Goguen) would not be threatening other officers with

---

[10] Id.

[11] R.83 (Goguen Dep.) at 62.

[12] Id. at 17.

-14-

lawsuits under his watch.[13] When it was determined that Mr. Goguen in fact had been on the telephone with a federal magistrate judge, Mr. Goguen was escorted back to the telephone to resume the call.

Also on August 31, Officer Rizzo wrote a disciplinary report and a notice of infraction for a violation of B-13, "Provocation," for arguing. These charges were later dismissed. The record does not contain either the report or the dismissal. The record does contain, however, an "Administrative Segregation Status Placement" dated August 31, 2011.[14] According to that document, Mr. Goguen was placed in segregation by Sergeant Plourd for "continually arguing with Staff in the performance of their duties" and "threatening Staff with lawsuits."[15] The following day, however, Lieutenant Bugbee reviewed the placement and removed Mr. Goguen from A-pod because Major Allen had "advise[d]" that Mr. Goguen did "not pose [a] threat to security."[16]

---

[13] See id. at 16–17.

[14] R.56-3 at 17.

[15] Id.

[16] Id.

Mr. Goguen remained in E-pod for a little over three and one-half hours. At that time, officers were conducting a count of the inmates. When officers reached Mr. Goguen's cell, his back was facing the officers, and he appeared to be urinating. Mr. Goguen later testified that he in fact was urinating during the count. Officer Rizzo wrote a disciplinary report and a notice of infraction for a violation of A–05, "Count."[17] Officer Rizzo also wrote up Mr. Goguen for violations of B–19, "Threatening," and B–13, "Provocation," for swearing and calling Officer Rizzo names. Mr. Goguen again was placed in A-pod.

On September 1, 2011, Officer Gilblair notified Mr. Goguen of this infraction and asked for Mr. Goguen's version of the events. On September 8, 2011, Mr. Goguen received notice that a disciplinary hearing for the incident was scheduled for September 13, 2011. Officer Crafts presided at the hearing, at which Mr. Goguen testified. As part of this hearing, Officer Crafts reviewed answers to written questions posed by Mr. Goguen to his cell mate. Following the hearing,

---

[17] R.56-11 (SCJ Policy-"Inmate Discipline") at 70. The policy defines this violation as follows: "A-05 Count-Non presence at or interfering with the taking of an inmate count, either formal or informal." Id.

-16-

Officer Crafts found Mr. Goguen guilty of the count violation, but not guilty of the threatening and provocation violations. For punishment, Officer Crafts imposed a $25 fine and three days' disciplinary segregation. Major Allen denied Mr. Goguen's appeal.

Mr. Goguen's administrative segregation initially was reviewed on September 4 by Lieutenant Campbell, who determined that Mr. Goguen should remain in A-pod. Mr. Goguen received notice to that effect and was advised that his placement would be reviewed again on September 9. At that hearing, Sergeant Plourd presided, and Officer French and non-defendant Officer Ducharme acted as committee members. The parties dispute the testimony that was given. According to the defendants, Mr. Goguen testified that there was an ongoing investigation concerning Officer Rizzo and other staff at the SCJ.[18] The committee determined that Mr. Goguen should remain in administrative segregation until the investigation into the incident concluded.

---

[18] Mr. Goguen now denies saying this; according to Mr. Goguen, he testified at the hearing that Officer Rizzo's statements should be investigated. Mr. Goguen, however, does not point to any sworn testimony in the record to support his denial.

Mr. Goguen's administrative segregation was again reviewed on September 16, with Lieutenant Campbell as hearing officer and non-defendant Officers Marose and Davis as committee members. At the hearing, the committee considered evidence that there was no investigation of SCJ officers pending, Mr. Goguen had no new write-ups, and he had been medically cleared. The committee determined that Mr. Goguen should be removed from administrative segregation, but placed on disciplinary segregation for an old write-up. On September 21, 2011, Mr. Goguen was transferred back to E-pod, where he remained until October 21, 2011.

**4. September 29 and October 2 Infractions**

On September 29, 2011, Officer Rizzo saw Mr. Goguen drinking black liquid from a cup. Officer Rizzo asked Mr. Goguen if he had a receipt for coffee; Mr. Goguen responded that he did not. Officer Rizzo told Mr. Goguen to dump it out, and, a few minutes later, Mr. Goguen complied. Mr. Goguen claims that the liquid was water and that it was the cup that was black. Officer Rizzo wrote a disciplinary report and a notice of infraction for a violation of C-04, "Giving, Receiving, or Swapping." According to Mr. Goguen's testimony, Officer Rizzo was on the upper tier, and he was on the lower tier when this

-18-

encounter occurred; Mr. Goguen asserts that the cup itself was "disgustingly black" and that Officer Rizzo refused to inspect it.[19]

Officer Meunier gave Mr. Goguen a notice of the September 29 infraction that same day. Officer Meunier spoke to Mr. Goguen and asked for his side of the story. The following day, Mr. Goguen received notice that a disciplinary hearing was scheduled for October 3, 2011.

On October 2, 2011, Mr. Goguen was seen eating half of a sandwich while he had a full uneaten sandwich on his tray. A review of video showed that another inmate had pushed his tray to the center of the table and that Mr. Goguen removed the sandwich. Non-defendant Officer Baldinelli wrote a disciplinary report and a notice for a violation of C-14, "Unauthorized Food,"[20] and Mr. Goguen received a copy of the notice. Non-defendant Officer Munn was assigned to investigate the incident and spoke to Mr. Goguen. Officer Munn told Mr. Goguen what the alleged violation was about. Mr. Goguen stated: "Ah f--k it"; he also stated that another inmate "threw us under the bus. I

---

[19] R.83 (Goguen Dep.) at 79.

[20] R.56-11 (SCJ Policy-"Inmate Discipline") at 73.

don't need to hear any more."[21]  The following day, Mr. Goguen was given notice that a disciplinary hearing for the sandwich incident was scheduled for October 6, 2011.

The disciplinary hearing for the coffee incident was held on October 3.  Officer Jeffrey Jacques served as the hearing officer.  Mr. Goguen testified at the hearing and stated that the liquid was water, not coffee.  He had been given a few still photos to present as evidence at the hearing.  Officer Jeffrey Jacques found Mr. Goguen guilty of the violation and imposed a one-day cell restriction.  An inmate on cell restriction is allowed to come out of the cell to eat, to shower, and for appointments, but may not leave the cell for recreation.  Mr. Goguen did not appeal this decision.

The disciplinary hearing for the sandwich incident was held on October 6.  Non-defendant Officer Michael Johnson was the hearing officer. Mr. Goguen pleaded guilty, and Officer Johnson imposed a four-hour cell restriction.

### 5.  October 13, 2011 Cell Search

On October 13, 2011, Sergeant Plourd ordered Officer Rizzo to perform a search of Mr. Goguen's cell.

---

[21] R.45-9 (Munn Aff.) at 1.

Mr. Goguen asserts that, during the search, Officers Rizzo and Eddie Jacques took thousands of pages of discovery related to one of Mr. Goguen's then-pending civil cases (against correctional officers at another county jail) and threw them on the floor. Some documents landed in the toilet and sink; all were out of order and strewn across the cell. The search uncovered a soap dish and soap; neither inmate in the cell had a receipt, and both disclaimed ownership of the items. Officer Rizzo found a cup of coffee, dried paper blocking most of the vent, and an empty coffee bag with a sugar packet under Mr. Goguen's mattress, all of which were contraband. Officer Rizzo also found an envelope on Mr. Goguen's side of the cell that was sealed and was marked as legal paperwork. Officer Rizzo opened the envelope and saw a memo from Major Allen, at which point he stopped and took the paperwork to Sergeant Plourd to review. Sergeant Plourd looked at the paperwork and instructed Officer Rizzo to return it to Mr. Goguen, which Officer Rizzo did.

Officer Rizzo wrote a disciplinary report and a notice of infraction for a violation of C-09, "Possession,"[22] concerning the items found in the cell, but the charge later was dismissed.

### 6. October 17, 2011 Shower Request

On October 17, 2011, Mr. Goguen was housed in a cell on the bottom tier in E-pod. He asked to go upstairs to shower and was told that he was not allowed to go to the upper tier for any reason and that, as a lower-tier inmate, he could not shower after the top of the hour. Later Mr. Goguen, along with another inmate named Gill, argued with Officer Rizzo about the shower rules.[23] The following day, Officer Rizzo wrote a disciplinary report and a notice of infraction for a violation of B-13, "Provocation," in connection with the shower incident. Officer Eddie Jacques investigated the incident and spoke to Mr. Goguen. The officer told Mr. Goguen the nature of the alleged violation, asked for Mr. Goguen's version of the events, and gave Mr. Goguen a copy of the notice. On October 20, 2011, Mr. Goguen received notice that a disciplinary hearing was scheduled for October 25, 2011. The hearing actually occurred

---

[22] R.56-11 (SCJ Policy-"Inmate Discipline") at 73.

[23] Mr. Goguen does not allege that the rules did not exist or that they were being enforced in an arbitrary manner.

on October 31, 2011, with Officer Jeffrey Jacques as hearing officer. The officer heard testimony from Mr. Goguen and also considered video footage and the written responses to questions posed by Mr. Goguen to Llewellyn Eaton, Officer Julie Hayden, and Officer Rizzo.[24] Officer Jeffrey Jacques found Mr. Goguen guilty of the provocation violation and imposed three days of disciplinary segregation. Major Allen denied Mr. Goguen's appeal.

### 7. Miscellaneous Incidents, Grievances, and Requests

Throughout September and October 2011, Mr. Goguen filed a number of grievances concerning the actions of SCJ officers. One grievance concerned a book entitled, "The Prisoner's Self Help Litigation Manual." According to Mr. Goguen, the book had been delivered to him at the beginning of September. When he returned from recreation on September 6, however, the book, as well as Mr. Goguen's personal notes on the book, had been removed from his cell, allegedly by Officer Shawn Maguire. Mr. Goguen filed a grievance concerning the missing book. On September 21, Officer Maguire wrote a

---

[24] Mr. Goguen also had posed questions to another inmate, Gill, but Gill had been released so was unavailable to respond to questions.

memorandum responding to this and four other grievances. Subsequently, Mr. Goguen filed grievances concerning his lack of access to various resources including law library books, prison policies, Title 34-A of the Maine Revised Statutes, and the self-help litigation manual; he also filed grievances concerning the staff at SCJ opening his legal mail.[25] One of these subsequent grievances, filed on September 29, concerned the actions of Officer Rizzo. According to Mr. Goguen's grievance, Officer Rizzo refused to have someone examine the documents that Mr. Goguen intended to bring to a meeting with his attorney.

---

[25] Non-legal mail is opened and inspected for contraband. Any mail that is determined to be legal mail is not to be opened, but is attached to a legal mail inspection form and forwarded to the housing unit. The following day an officer in the housing unit delivers the mail and opens any legal mail in the presence of the inmate. Once the officer determines that the mail does not contain contraband, the legal mail is turned over to the inmate.

Inmates are not allowed to have sealed envelopes in their cells, and there is no exception for legal mail. SCJ policy does permit inmates to send sealed envelopes without censoring, inspection, or restriction to certain recipients.

According to the defendants, if an inmate in A-pod has outgoing legal mail, A-pod officers go around on the night shift with a sealed box for the inmate to place any legal mail in the box. The inmate seals the envelope immediately before placing it in the box. For inmates in E-pod, there is a box for mail in the pod. This box is picked up daily. The inmate can seal any mail right before placing it in the box. Mr. Goguen maintains that there is no rule about having to seal or not seal any envelopes.

According to Mr. Goguen, Officer Rizzo both denied his request and taunted him in doing so.

On October 12, Officer Margaret Kelly confiscated Mr. Goguen's legal file as he arrived for a meeting with his attorney, although the documents already had been examined for contraband and had been authorized for use at the meeting. The file was returned to Mr. Goguen later, but he did not have the benefit of his research and documentation in discussing his criminal case with counsel.

### 8. October 21, 2011 Placement in A-pod

On October 21, 2011, Lieutenant Bugbee placed Mr. Goguen in administrative segregation and transferred him to A-pod because he "pose[d] a serious threat [to the] security or orderly running of the institution."[26] The "factual basis for [the] placement" was that Mr. Goguen had not "adjust[ed] to the rules and regulations set forth by this facility" and had continued to argue with and "be[] confrontational with Staff."[27] This placement was reviewed by non-defendant Sergeant Pullen on October 24, 2011, who determined that Mr. Goguen should remain

---

[26] R.56-3 (Administrative Segregation Status Placement dated 10/21/11) at 23.

[27] Id.

in administrative segregation; Mr. Goguen was provided with notice of this decision the day it issued.

### 9. Maximum Security Classification

On October 26, 2011, Mr. Goguen was reclassified from medium security to maximum security because it was determined that he was a danger to the safety and security of the facility. Mr. Goguen received notice of his reclassification, and he appealed the reclassification decision. The appeal hearing was held on November 1, 2011. At the appeal hearing, the classification committee consisted of Officer Theresa Brown, Lieutenant Bugbee and two non-defendant officers, Stephen Giggey and Chris Murray. Mr. Goguen was present and testified at the hearing. The classification committee reviewed log entries concerning Mr. Goguen dated between July 23, 2011, and October 21, 2011. It determined that Mr. Goguen would remain in maximum security because he was very argumentative and disrespectful to officers and because he was unable to follow the rules of the facility. The classification committee makes its determinations based on majority vote.

Mr. Goguen was told that he could appeal his classification decision to Major Allen, but he did not do so.[28] According to Mr. Goguen, an appeal would have been futile because it was Major Allen who had reclassified him to maximum security only five days earlier. Mr. Goguen remained in A-pod from October 21, 2011, until he was transferred out of SCJ in December 2011.

Maximum security inmates are allowed the same amount of recreation, time for showers, and time for phone calls as inmates in administrative segregation. However, corrections officers place maximum security inmates in four-point restraints when they use the library cart and make phone calls. Mr. Goguen maintains that Sergeant Plourd imposed this requirement only on him, and this practice prevented him from accessing the library cart.[29] He testified that this practice was enforced by Lieutenant Bugbee and Officer Jessica Almeida as well.[30]

---

[28] An inmate is permitted to request review of classification status by a classification supervisor every sixty days. An inmate's classification status is automatically reviewed every ninety days.

[29] See R.83 (Goguen Dep.) at 42.

[30] See id. at 43, 100.

## 10. Other Incidents

Among the other bases for Mr. Goguen's complaints is that a drawing he made was confiscated as contraband because it contained gang symbols. Mr. Goguen had left the drawing inside a magazine in his cell, and the magazine with the drawing still in it was found in the possession of another inmate. Color drawings are considered contraband at the SCJ because some colored drawings have been used to conceal drugs; the inmates lick or swallow the colored paper to get high. Mr. Goguen maintains that there were no gang symbols in the drawing and questions whether inmates are able to hide drugs in a drawing made inside the SCJ.

Mr. Goguen also testified that, on November 6, 2011, after being reclassified as a maximum-security inmate, Officers Eddie Jacques and Meunier ordered him to turn his back to the cell door and put his hands together out through a door slot. They then handcuffed him and pulled the door open suddenly, wrenching his arms and shoulders and causing severe pain in his shoulder and back.[31]

---

[31] See id. at 94–95.

Finally, Mr. Goguen recounted that, in December 2011, he was moved by Officer Meunier from an observation cell to another A-pod cell that had blood, vomit, and feces in it. According to Mr. Goguen, both Officer Meunier and Officer Kelly denied him supplies to clean the cell.

**B.**

**1.**

Mr. Goguen filed this action under 42 U.S.C. § 1983, naming numerous officers and administrators at SCJ.[32] In his second amended complaint, Mr. Goguen detailed the events described above and alleged that these and other actions taken by the defendants violated his right to be free from unreasonable searches and seizures under the Fourth Amendment, violated his right to due process under the Fourteenth Amendment, his right to petition the Government for redress under the First Amendment, his right of access to counsel under

---

[32] Specifically, Mr. Goguen named the following defendants: Major Allen, Lieutenant Bugbee, Sergeant Plourd, Classifications Supervisor Theresa Brown, and Officers Almeida, Crafts, French, Gilblair, Hayden, Eddie Jacques, Jeffrey Jacques, Kelly, Maguire, Meunier, Rizzo, and Cory Swope.

the Sixth Amendment, and his right under the Eighth Amendment to be free from cruel and unusual punishment.[33]

---

[33] He alleged:

(1) Officers intentionally had "fabricat[ed] reports knowing the results would lead to immediate segregation [and] use[d] administrative segregation . . . as a means to punish" him, in violation of his Fourteenth Amendment due process rights;

(2) Officers intentionally had "confiscat[ed] [his] legal documents, law library books," and other materials, arbitrarily had prevented him from using the library cart, and had interfered with his confidential communication with courts and his counsel, in violation of the First and Sixth Amendments and state law;

(3) Officers arbitrarily had kept him in administrative segregation, in violation of his Fourteenth Amendment due process rights;

(4) Officers had "persecuted" him in retaliation for his "filing grievances" and "complaining to officials about wrongful conduct," in violation of the First Amendment;

(5) Officers deliberately and repeatedly had "subjected [him] to visual body cavity searches without justification," in violation of his Fourth, Eighth, and Fourteenth Amendment rights;

(6) Officers had confined him to an unsanitary cell and had provided him unsanitary food service, in violation

-30-

Following discovery, the defendants filed a comprehensive dispositive motion. The defendants maintained that many of Mr. Goguen's allegations -- that officers had denied him use of his legal materials during his meeting with his attorney, had limited his access to the library cart, and had served him food in an unsanitary manner, for example -- failed to state a claim for relief. The defendants moved for summary judgment on the merits with respect to Mr. Goguen's claim that he had suffered retaliation. According to the defendants, it was "difficult to discern . . . which actions the Plaintiff allege[d] were retaliation"; but, with respect to the situations he had mentioned specifically, there was no evidence of a causal link between his grievances and the alleged retaliation.[34] The defendants also argued that they were entitled to summary judgment with respect to Mr. Goguen's Fourteenth Amendment Due Process claim and with respect to his Eighth Amendment claim. Turning to the Due Process claim, the

---

        of his Eighth and Fourteenth Amendment
        rights; and

    (7) Officers collectively had conspired to
        deprive him of his constitutional
        rights.

R.24 at 51-54.

[34] R.44 at 13–14.

-31-

defendants noted that, under Bell v. Wolfish, 441 U.S. 520 (1979), the key question was whether the conditions to which Mr. Goguen was subjected constituted "punishment" that required "'an adjudication of guilt in accordance with due process of law.'"[35] However, they continued, "not all restrictions placed upon a pretrial detainee are punishment": a condition, restriction or disability "'reasonably related to a legitimate governmental objective, . . . does not, without more, amount to "punishment."'"[36] They submitted that, because Mr. Goguen's placements in administrative segregation were justified initially by his violations of jail rules, and then were reviewed within seventy-two hours, the requirements of due process were met.

The defendants also maintained that they were entitled to summary judgment on Mr. Goguen's constitutional claims related to being strip searched. They noted that, after balancing the interests of the institution against the privacy interests of the inmates, the Supreme Court in Bell had concluded that subjecting a pretrial detainee to visual body-cavity inspections following contact with individuals from

---

[35] Id. at 16 (quoting Bell v. Wolfish, 441 U.S. 520, 535 (1979)).
[36] Id. (quoting Bell, 441 U.S. at 539).

outside the institution did not violate due process. They argued that the strip searches to which Mr. Goguen was subjected while he was in administrative segregation similarly were justified by concerns of "'[m]aintaining institutional security and preserving internal order and discipline.'"[37] Alternatively, the defendants contended that they were entitled to qualified immunity on this claim. According to the defendants, "it [wa]s not clearly established that the officers involved in strip searching inmates, including those who are pretrial, upon entry or exit from a cell in A-pod were violating a constitutional right. Any mistake as to the constitutionality of their actions was reasonable."[38]

**2.**

After briefing was completed, the magistrate judge issued an exhaustive report and recommendation. In it, the magistrate judge summarized Mr. Goguen's claims accordingly:

> Goguen maintains that he was subjected to intentional punishment based on his tendency to file grievances and speak out if he perceived what he believed to be a violation of his rights or a violation of prison policy, and also based on his litigation against correctional officers

---

[37] Id. at 26 (quoting Bell, 441 U.S. at 546).

[38] Id. at 27.

from another facility. The punishment consisted of excessive confinement in administrative segregation, unreasonable reclassification to maximum security, excessive strip searches and body cavity searches, confiscation of legal documents, interference with his communications with the court and with counsel, confiscation of personal property, placement in an unsanitary cell, unsanitary food practices, application of excessive force, and imposition of four-point restraints to frustrate access to legal materials. Goguen also advances a claim of [F]irst [A]mendment retaliation, another claim that has the ability to gather up multiple circumstances in support of one claim. In addition to advancing these two core theories, Goguen also itemizes a laundry list of smaller claims based on each distinct incident of which he complains.[39]

The magistrate judge then reviewed each of these claims. With respect to Mr. Goguen's claim that he was subjected to punitive strip searches, the magistrate judge explained that

[t]he real issue here involves the imposition of punishment on a pretrial detainee, without adequate predeprivation process. Although Goguen's move was classified as administrative segregation rather than disciplinary segregation, if the conditions of confinement imposed on him in A-pod crossed the punishment threshold, a claim is established for imposing prehearing punishment on a pretrial detainee.[40]

---

[39] Goguen v. Gilblair, No. 2:12-cv-00048-JAW, 2013 WL 5407225, at *24 (D. Me. Sept. 25, 2013).

[40] Id. at *29.

-34-

The magistrate judge noted that there were additional restrictions attendant to administrative segregation, but concluded that it was not necessary "to decide whether these conditions, in combination, cross the 'punitive' threshold for a pretrial detainee," because Mr. Goguen's placement in administrative segregation also involved "multiple daily strip searches and visual body cavity searches."[41]  "This final condition," the magistrate judge explained, "is sufficient to support a finding of punitive confinement, without due process, regardless of the fact that Somerset County calls it 'administrative' confinement."[42]  Critical to the magistrate judge's conclusion was the fact that,

> after Goguen eventually received process at the Jail, his actual sanctions typically paled in comparison to what he experienced while waiting for the process to unfold. For example, he was assessed three days of disciplinary segregation for urinating during count, but suffered approximately 13 days of what amounted to disciplinary segregation while awaiting his hearing.[43]

---

[41] Id.

[42] Id.

[43] Id.

The magistrate judge therefore concluded that "[t]hese conditions . . . raise a genuine issue of material fact concerning the denial of due process."[44]

Addressing the retaliation claim, the magistrate judge found that Mr. Goguen had established a causal link between his protected activity -- filing grievances -- and several actions of the defendants, such as placing Mr. Goguen in four-point restraints, destroying legal documents incident to a search, and subjecting Mr. Goguen to physical pain.

The magistrate judge then reviewed her findings and concluded that, with respect to Officers Brown, Crafts, Hayden, Maguire, Swope, and Jeffrey Jacques, Mr. Goguen had not sufficiently developed his claims. As for the due process claim, however, she concluded that there was sufficient evidence to raise a genuine issue of material fact

> concerning those officers who either
> supported or directed the imposition of
> administrative segregation on Goguen prior
> to completion of the due process procedures
> outlined in Wolff v. McDonnell[45] and against

---

[44] Id.

[45] In Wolff v. McDonnell, 418 U.S. 539, 563 (1974), the Court held that "the minimum requirements of procedural due process" are satisfied by providing to prisoners "advance written notice of the claimed violation and a written statement of the

> those officers who actually conducted or ordered Goguen to comply with the strip search and visual body cavity search process while Goguen was subject to so-called "administrative" segregation.[46]

According to the magistrate judge, those defendants were Major Allen, Lieutenant Bugbee, Sergeant Plourd, and Officers Almeida, French, Gilblair, Meunier, and Rizzo. Turning to the retaliation claim, the magistrate judge determined that

> there is a genuine issue concerning those officers who supported or directed the imposition of administrative segregation on Goguen prior to completion of the due process procedures outlined in <u>Wolff</u> v. <u>McDonnell</u>, and the cumulative impact of disrupting court conferences, scattering legal papers throughout Goguen's cell, imposing four-point shackles when Goguen accessed the library cart, and using unnecessary force. This claim is viable against Allen, Almeida, Bugbee, Gilblair, Kelly, Meunier, Plourd, and Rizzo.[47]

The magistrate judge also addressed the defendants' assertion of qualified immunity. She explained that her "recommendation that the due process and retaliation claims go forward is premised in large measure on the imposition of multiple daily strip searches and visual body cavity searches on

---

factfinders as to the evidence relied upon and the reasons for the disciplinary action taken."

[46] <u>Goguen</u>, 2013 WL 5407225, at *32.

[47] <u>Id.</u>

-37-

a pretrial detainee in advance of <u>Wolff</u> v. <u>McDonnell</u> process."[48] The magistrate judge rejected the defendants' argument that established case law allowed for the routine strip searching of inmates upon leaving or entering a segregation unit:

> The cases do reflect that the use of such searches is permitted in the context of introduction to a facility, or transfer to segregated confinement, or upon return from contact visits. <u>Bell</u> v. <u>Wolfish</u> itself supports the point as even pretrial detainees were subject to a facility-wide policy of imposing strip searches following contact visits. The difference in this case, however, is that the issue concerns compliance with the <u>Wolff</u> v. <u>McDonnell</u> due process requirements before transferring a pretrial detainee in general population to punitive conditions in segregated confinement. A change in conditions that imposes multiple daily strip- and visual body cavity searches as the price of any out-of-cell liberty can reasonably be deemed punitive in comparison to the conditions of prison life existing in general population. The right of a pretrial detainee to receive due process prior to the imposition of prison-based punishment has been clearly established since the 1970s decisions in <u>Wolff</u> v. <u>McDonnell</u> and <u>Bell</u> v. <u>Wolfish</u>. Consequently, I recommend that the court not recognize qualified immunity in this particular context.[49]

---

[48] <u>Id.</u>

[49] <u>Id.</u> at *33.

In short, the magistrate judge determined that the record presented a genuine issue of triable fact as to (1) whether the defendants' actions in transferring Mr. Goguen to administrative segregation were punitive in nature, especially considering the conditions in A-pod compared to the infractions which prompted his transfer, and (2) whether the officers' motives in taking these and other actions were prompted by Mr. Goguen's protected activity in violation of the First Amendment.

The defendants filed objections to the magistrate judge's recommendations. The district court, however, affirmed the recommended disposition in its entirety. The defendants timely appealed.[50]

---

[50] In their notice of appeal, the defendants identified the following portions of the order as the bases for their appeal:

> (1) the decision that Allen, Almeida, Bugbee, French, Gilblair, Kelly, Meunier, Plourd and Rizzo are not entitled to qualified immunity on the claim that they violated procedural due process by imposing administrative segregation on Goguen; and
>
> (2) the decision that Allen, Almeida, Bugbee, Gilblair, Eddie Jacques, Kelly, Meunier, Plourd and Rizzo are not entitled to qualified immunity on the claim that they retaliated against Goguen in violation of his First Amendment rights; and

-39-

                    (3) the decision that Allen, Almeida,
                        Bugbee, French, Gilblair,
                        Eddie Jacques, Kelly, Meunier, Plourd
                        and Rizzo are not entitled to qualified
                        immunity on the conspiracy claim.

R.76 at 1-2.

In their summary judgment motion, however, the defendants urged that they were entitled to qualified immunity only with respect to Mr. Goguen's claims related to the strip searches:

> Considering the Court's recent decision in Florence [v. Board of Chosen Freeholders, 132 S. Ct. 1510 (2012)], it is not clearly established that the officers involved in strip searching inmates, including those who are pretrial, upon entry or exit from a cell in A-pod were violating a constitutional right. Any mistake as to the constitutionality of their actions was reasonable.

R.44 at 27. In their objections to the report and recommendation, the defendants attempted to expand their qualified immunity argument to all of the claims on which they had maintained that they were entitled to judgment as a matter of law:

> The qualified immunity standard is very broad and protects "all but the plainly incompetent or those who knowingly violate the law." In this case, a discussion of why there were not constitutional violations is made above. In addition, Defendants Allen, Almeida, Bugbee, French, Eddie Jacques, Gilblair, Kelly, Meunier, Plourd and Rizzo are entitled to qualified immunity because the right in question was not clearly established.

R.70 at 13 (citations omitted). In their briefing before this court, the defendants primarily focused on the use of strip searches for detainees in administrative segregation. We cannot conclude that this sufficed to raise the issue of the

Our first task is to determine whether we may entertain the defendants' appeal. Mr. Goguen argues that we have jurisdiction over an interlocutory appeal from the denial of summary judgment on qualified immunity grounds "only when the denial of the motion is based on 'purely legal' grounds."[51] He maintains therefore that we do not have jurisdiction over this appeal because the magistrate judge concluded that there were "question[s] of fact to be resolved by the factfinder" concerning the punitive nature of Mr. Goguen's confinement.[52] We agree that appellate jurisdiction is lacking.

**A.**

In <u>Johnson</u> v. <u>Jones</u>, 515 U.S. 304 (1995), the Supreme Court considered whether an appellate court could entertain "an

---

defendants' qualified immunity with respect to Mr. Goguen's claims unrelated to strip searches.

That said, while Mr. Goguen focused exclusively on this issue, he does not maintain that the defendants' other qualified immunity arguments are subject to forfeiture. Consequently, we have considered the defendants' arguments on qualified immunity that are not related directly to the strip searching of pretrial detainees in administrative segregation. For the reasons set forth <u>infra</u> at II.B., however, these arguments do not alter our conclusion that we lack jurisdiction over the present appeal.

[51] Appellee's Br. 5.

[52] <u>Id.</u> (internal quotation marks omitted).

immediate appeal of a district court order denying [the defendants'] motion for summary judgment" when "[t]he order in question resolved a fact-related dispute about the pretrial record." Id. at 307. Guided by the language of the statute authorizing appellate review (28 U.S.C. § 1291), the narrowness of the collateral order doctrine, and its decision in Mitchell v. Forsyth, 472 U.S. 511 (1985), in which it had recognized the denial of qualified immunity as an appealable order, the Court concluded that "a defendant, entitled to invoke a qualified immunity defense, may not appeal a district court's summary judgment order insofar as that order determines whether or not the pretrial record sets forth a 'genuine' issue of fact for trial." Johnson, 515 U.S. at 319–20.

Beginning with Stella v. Kelley, 63 F.3d 71 (1st Cir. 1995), we have explored the contours and confines of Johnson's holding. In Stella, we observed that,

> on the one hand, a district court's pretrial rejection of a proffered qualified immunity defense remains immediately appealable as a collateral order to the extent that it turns on a pure issue of law, notwithstanding the absence of a final judgment. On the other hand, a district court's pretrial rejection of a qualified immunity defense is not immediately appealable to the extent that it turns on either an issue of fact or an issue perceived by the trial court to be an issue of fact. In such a situation, the movant

-42-

> must await the entry of final judgment
> before appealing the adverse ruling.
>
> The bottom line, then, is simply this:
> a summary judgment order which determines
> that the pretrial record sets forth a
> genuine issue of fact, as distinguished from
> an order that determines whether certain
> given facts demonstrate, under clearly
> established law, a violation of some
> federally protected right, is not reviewable
> on demand.

Id. at 74 (emphasis added) (citations omitted).[53]

We had an opportunity to apply Johnson again in Díaz v.

Martínez, 112 F.3d 1 (1st Cir. 1997). In that case, the

plaintiffs sued defendant Díaz, a rogue police officer, and his

supervisor, Tomás Vázquez Rivera, for the personal injuries and

the wrongful death of a family member stemming from defendant

Díaz's use of his weapon. Vázquez moved for summary judgment on

qualified immunity grounds, the district court denied the

motion, and Vázquez appealed. We noted that, "under Johnson and

Stella, . . . a defendant who, like Vázquez, has unsuccessfully

sought summary judgment based on qualified immunity is permitted

to appeal the resultant denial on an interlocutory basis only to

---

[53] See also Behrens v. Pelletier, 516 U.S. 299, 313 (1996) ("Johnson reaffirmed that summary judgment determinations are appealable when they resolve a dispute concerning an 'abstract issu[e] of law' relating to qualified immunity." (alteration in original)).

the extent that the qualified immunity defense turns upon a 'purely legal' question." Id. at 3 (emphasis added). We concluded that Vázquez's appeal "withers in the hot glare of these precedents." Id. at 4. We explained:

> [W]e are left with Vázquez's asseveration that the district court erred in denying his motion for summary judgment because, regardless of legal theory, the evidence was insufficient to establish deliberate indifference on his part, and, thus, he was entitled (at the least) to qualified immunity. But Judge Laffitte rejected this argument on the basis that the record contained controverted facts and that, if a factfinder were to resolve those disputes favorably to the plaintiffs, he could then find that Vázquez's supervision of the disciplinary affairs bureau was so pathetic that his conduct constituted deliberate indifference to the plaintiffs' rights. Since Vázquez does not argue that the facts asserted by the plaintiffs, even if altogether true, fail to show deliberate indifference -- he argues instead what his counsel termed at oral argument "the absence of facts," i.e., that the facts asserted by the plaintiffs are untrue, unproven, warrant a different spin, tell only a small part of the story, and are presented out of context -- the district court's determination is not reviewable on an interlocutory appeal.

Id. at 4-5 (emphasis added) (footnote omitted).

Two of our recent opinions speak directly to this issue in factual scenarios closely akin to that presented here. The first of these is Cady v. Walsh, 753 F.3d 348 (1st Cir.

-44-

2014). In that case, Cady brought an action on behalf of her son, Paul Galambos, after Galambos died "from self-inflicted injuries that he suffered while he was a pretrial detainee at the Cumberland County Jail (CCJ)." Id. at 349. Cady alleged that the defendants had been deliberately indifferent to her son's medical needs while he was detained at CCJ; the defendants, in response, filed a motion for summary judgment, in which they maintained that they were protected by qualified immunity. The district court, however, disagreed and denied the motion, reasoning "that there remained material and disputed issues of fact as to the claims against all three individuals which precluded the grant of immunity." Id. at 350. The defendants subsequently appealed.

Before this court, Cady argued that, under Johnson, we lacked jurisdiction to review the appeal. We therefore began our analysis of the jurisdictional issue with Johnson:

> Because the "qualified immunity defense is, in part, an immunity from trial as well as an immunity from damage awards," a pre-trial denial of the defense may, in some cases, be immediately appealable. . . . The Johnson Court held that a district court's conclusion that a summary judgment record in a qualified immunity case raised a genuine issue of fact as to whether the defendants were involved in the alleged events was not immediately appealable under the collateral order doctrine.

-45-

Johnson relied in part on the "separability" requirement of the collateral order doctrine. The Court reasoned:

> Where . . . a defendant simply wants to appeal a district court's determination that the evidence is sufficient to permit a particular finding of fact after trial, it will often prove difficult to find any such "separate" question -- one that is significantly different from the fact-related legal issues that likely underlie the plaintiff's claim on the merits.

> Questions of "evidentiary sufficiency" -- i.e., whether the record is capable of supporting a particular factual finding, rather than a particular legal conclusion -- "are not sufficiently distinct to warrant interlocutory appeal." If appellate courts were to overlook this separability problem in the context of fact-based qualified immunity appeals and accept jurisdiction, those courts "may well be faced with approximately the same factual issue again, after trial," and interlocutory review would prove an unwise use of appellate resources.

Id. at 358–59 (citations omitted) (quoting Johnson, 515 U.S. at 314, 316–17; Mlodzinski v. Lewis, 648 F.3d 24, 27 (1st Cir. 2011)).

In Cady, we faulted the defendants for failing to "develop the argument that, even drawing all the inferences as the district court concluded a jury permissibly could, they are

-46-

entitled to judgment as a matter of law." Id. at 359–60. We acknowledged that there had been cases in which the defendants had accepted as true the plaintiffs' version of the facts (and the reasonable inferences from those facts), and we had exercised jurisdiction. Id. at 360 (citing Mlodzinski, 648 F.3d at 28). The defendants in Cady, however, had not done so; instead, their briefing disputed "both the facts identified by the magistrate judge as well as the inferences proffered by the plaintiff and deemed reasonable by the magistrate judge." Id. We explained:

> With respect to each individual defendant, the defendants' briefing objects to the way the district court construed the facts and argues that the district court and magistrate judge erred in their conclusions as to what a reasonable juror could find. Those fact-based arguments are inextricably intertwined with whatever "purely legal" contentions are contained in the defendants' briefs: were we to attempt to separate the legal from the factual in order to address only those arguments over which we might permissibly exercise jurisdiction, we simply would not know where to begin. . . . [T]he defendants' brief repeatedly attacks the district court's factual conclusions, making no effort to separate fact-based arguments from "purely legal" ones.

Id. The defendants' "fact-based challenge[s]," we explained, "would . . . not defeat jurisdiction if [they] were advanced in the alternative. But nowhere in the defendants' brief does

-47-

there appear any developed argument that the defendants are entitled to summary judgment even if the district court's conclusions about the record were correct." Id. at 361. We therefore concluded that, "[b]ecause the defendants fail[ed] to pose even the qualified immunity question in a manner that would permit us to conclude that 'the answer to it does not depend upon whose account of the facts is correct,' we lack[ed] the authority to provide an answer." Id. (quoting Stella, 63 F.3d at 75).

Penn v. Escorsio, 764 F.3d 102 (1st Cir. 2014), petition for cert. filed, 83 U.S.L.W. 3586 (U.S. Dec. 15, 2014) (No. 14-709), is our latest substantive decision on the subject. As with Cady, Penn involved allegations that corrections officers were deliberately indifferent to the serious medical needs of a pretrial detainee, Lalli, and the defendant officers had moved for summary judgment on qualified immunity grounds. The defendants did not dispute that "clearly established law at the time Lalli attempted suicide dictated officers must take some reasonable measures to thwart a known, substantial risk that a pre-trial detainee will attempt suicide." Id. at 105. "Rather," we explained,

> Defendant Winslow argues he was not
> deliberately indifferent, and therefore did

-48-

not violate Lalli's rights because "the summary judgment record does not support finding a genuine issue as to whether Winslow actually knew of the risk [that Lalli would attempt suicide] or whether Winslow was deliberately indifferent to that risk." Similarly, Defendant Escorsio argues she "was not deliberately indifferent to Lalli's Fourteenth Amendment rights because she took some action to avert the risk of harm." But these discussions "nowhere develop the argument that, even drawing all the inferences as the district court concluded a jury permissibly could, they are entitled to judgment as a matter of law." Instead, Winslow's arguments take issue with the district court's factual determinations as to his knowledge of risk and his efforts -- or lack thereof -- to abate that risk. Similarly, Escorsio's arguments dispute the court's factual finding that she may have taken essentially no action to avert the risk Lalli would attempt suicide when she returned him to Cell 135.

As we recently stated in Cady, these "fact-based challenge[s] would, of course, not defeat jurisdiction if . . . advanced in the alternative. But nowhere in the defendants' brief does there appear any developed argument that the defendants are entitled to summary judgment even if the district court's conclusions about the record were correct." As such, we have no basis on which to exercise jurisdiction over whether Defendants violated Lalli's clearly established rights through deliberate indifference to the risk that he would attempt suicide.

Id. at 111 (alterations in original) (footnote omitted) (citations omitted).

-49-

**B.**

Our review of the defendants' briefing before this court convinces us that their arguments suffer from the same infirmities as those of the defendants in <u>Stella</u>, <u>Díaz</u>, <u>Cady</u>, and <u>Penn</u>. In their recitation of the facts and substantive arguments, the defendants repeatedly ignore evidence, and reasonable inferences therefrom, on which the magistrate judge based her conclusion that there were genuine issues of material fact concerning whether the defendants' actions were punitive and retaliatory.

By way of example only, the defendants fail to acknowledge the direct evidence that Officer Rizzo and Major Allen both were using administrative segregation as a means of retaliating against Mr. Goguen for his filing of grievances and use of the courts.[54] Moreover, with respect to the incident on June 23, the defendants never acknowledge three key pieces of evidence that point to the conclusion that

---

[54] <u>See</u> R.83 (Goguen Dep.) at 62 (recounting Officer Rizzo's statement that he would "'do whatever it takes in my personal power to make sure you spend the rest of your time in A[-] pod'"); <u>id.</u> at 17 (relating Major Allen's disruption of Mr. Goguen's call with the federal magistrate judge and placement of Mr. Goguen in A-pod following Major Allen's discovery that Mr. Goguen had been threatening officers with lawsuits).

Mr. Goguen's initial placement in administrative segregation was retaliatory: (1) Mr. Goguen testified that he did nothing to interfere with the cell search or provoke the officers involved, but it was Officer Gilblair who yelled and cursed at him; (2) the officers cited this (disputed) lack of cooperation as the reason for transferring Mr. Goguen to A-pod; and (3) the search took place the same day that Mr. Goguen testified against Officer Gilblair with respect to the complaint of a fellow inmate. The defendants also ignore evidence pointing to a retaliatory placement in administrative segregation following the dispute over the July 15 bunk assignments. The defendants repeat throughout their brief that Mr. Goguen refused Officer Rizzo's order to take the top bunk. Mr. Goguen, however, explicitly refuted this in his deposition. Yet, the basis for Mr. Goguen's disciplinary action -- and his placement in A-pod -- was his failure to obey an order. Finally, in addition to their failure to acknowledge critical evidence, the defendants' brief explicitly questions the bases for some of the district court's findings.[55] Like the defendants in Cady, it is

---

[55] See Appellants' Br. 38-39 ("While the Recommended Decision stated that Allen had direct oversight or involvement related to one or more impositions of administrative segregation, Rec. Dec., p.45, there is no evidence to this effect."); id. at 41

clear that "the defendants' briefing objects to the way the district court construed the facts." 753 F.3d at 360. They make no "'purely legal' contentions" that we are able to separate from these factual assertions. Id.

After Mr. Goguen raised the issue of our jurisdiction in his responsive brief, the defendants did acknowledge the rule that they could seek immediate review only if the district court's judgment "'turn[ed] on an issue of law.'"[56] They maintained, however, that, "[i]f the denial of qualified immunity was based on factual issues, the decision 'is still reviewable if qualified immunity is warranted on the plaintiff's version of the facts together with facts that are not disputed.'"[57]

---

("The basis for the due process claim against Gilblair and Meunier is that they allegedly wrote false reports based on the cell search on June 23, 2011, that resulted in Goguen being put in administrative segregation. Rec. Dec., p.52. There is no evidence to support this allegation, though."); id. at 48 n.6 ("While the Recommended Decision states that the photographic evidence supports Goguen's contention that one cannot watch a cell search from downstairs . . . , Rec. Dec., p.9, it is unclear how the court made this determination from this one photograph especially when it is unknown where Goguen's cell was located.").

[56] Reply Br. 6 (quoting Maldonado v. Fontanes, 568 F.3d 263, 267 (1st Cir. 2009)).

[57] Id. (quoting Cruz-Gómez v. Rivera-Hernández, 444 F.3d 29, 33 n.5 (1st Cir. 2006) (emphasis omitted)).

The problem for the defendants is that, in their reply, they did not change tack, accept the district court's factual findings, and make an argument based on those findings. Instead, they maintained that Mr. Goguen's recitation of facts should be ignored because it relied, in large part, on the unsworn allegations set forth in his second amended complaint. It is true that Mr. Goguen's recitation of facts has its own infirmities.[58] The district court, however, did not rest its findings on Mr. Goguen's unsworn allegations, but, instead, "looked to Goguen's deposition to determine whether he ha[d] offered any sworn testimony to support his unsworn factual assertions."[59] Indeed, the defendants characterize many facts as

---

[58] We agree with the defendants that unsworn allegations contained in a complaint, without more, are not enough to oppose a properly supported motion for summary judgment. See, e.g., Ruiz-Rosa v. Rullán, 485 F.3d 150, 156 (1st Cir. 2007). We similarly reject Mr. Goguen's argument that we should accept the facts set forth in his second amended complaint because, "had Mr. Goguen understood the complicated civil rules, especially regarding summary judgment, he would certainly have styled his Second Amended Complaint as a Verified Complaint, thus muting Defendants' refrain that his averments are unsupported by sworn testimony." Appellee's Br. 8. We have long held, and oft repeated, that "pro se status does not free a litigant in a civil case of the obligation to comply with procedural rules." Ruiz Rivera v. Riley, 209 F.3d 24, 28 n.2 (1st Cir. 2000).

[59] Gilblair, 2013 WL 5407225, at *3.

being supported only by unsworn statements, when, in fact, they find support in Mr. Goguen's deposition testimony.[60]

The Supreme Court held in Johnson, and we reiterated in Cady, that "a district court's conclusion that a summary judgment record in a qualified immunity case raise[s] a genuine issue of fact as to whether the defendants were involved in the alleged events [is] not immediately appealable under the collateral order doctrine." Cady, 753 F.3d at 358–59. Similarly, on an interlocutory appeal, we are not at liberty to reexamine a district court's determination that there is a genuine issue of material fact as to a government actor's motivation in taking specific actions. See Valdizán v. Rivera-Hernandez, 445 F.3d 63, 65 (1st Cir. 2006). As our discussion here demonstrates, "overlook[ing] this separability problem" would leave us mired in numerous factual disputes that we well may face again after trial. Cady, 753 F.3d at 359. Under such

---

[60] Among these are allegations that, on June 18, 2011, Mr. Goguen both filed a witness statement in support of another inmate's complaint against Officer Gilblair and filed his own grievance against Officer Gilblair, see R.83 (Goguen Dep.) at 47; that Officer Gilblair failed to return property, books, and legal papers that she had collected from Mr. Goguen, see id. at 49; and that Major Allen placed Mr. Goguen in A-pod following his telephone conference with the magistrate judge, see id. at 16–17.

circumstances, the collateral order doctrine does not allow, and concern for the wise use of judicial resources warns against, the exercise of appellate jurisdiction.[61]

---

[61] In their brief, the defendants urge that we should approach Officer Kelly differently because "[i]t appears the claims against Kelly were inadvertently left in this case." Appellants' Br. 53. We think that the constraints placed on our jurisdiction prevent our addressing this assertion here.

According to the defendants, the magistrate judge concluded that "Kelly should be entitled to summary judgment because 'the only thing that would keep Kelly in this case is the unsanitary cell episode, which was not exhausted administratively.'" Id. at 54 (quoting Goguen, 2013 WL 5407225, at *30). We do not believe that this is a fair reading of the magistrate judge's report. The quote on which the defendants rely is part of her discussion of Mr. Goguen's "Conspiracy" allegation. See Goguen, 2013 WL 5407225, at *30 (observing that "the overall facts and circumstances would permit a finding of concerted action sufficient to infer an agreement among some of the defendants to deprive Goguen of his rights," but that "the facts developed . . . do not warrant sweeping" other officers into the conspiracy and further noting that "the only thing that would keep Kelly in this case is the unsanitary cell episode, which was not exhausted administratively" (emphasis added)). At several other points in her opinion, however, the magistrate judge notes Officer Kelly's involvement in the alleged retaliatory actions against Mr. Goguen. See id. at *25 ("Goguen claims violations of the First Amendment and the Sixth Amendment related to the right to access the court and counsel, based on the seizure of legal papers and books, denial of law library access and materials, and interference with communications with the court and with counsel, asserted against Defendants Allen, Bugbee, Gilblair, Jacques, Kelly, Maguire, Meunier, Plourd, Rizzo, and Swope. . . . [F]acts and circumstances related to throwing Goguen's legal papers about, opening his mail, interrupting his conferences with the court, and so forth, are relevant to the core claims of imposing punishment on a pretrial detainee without due process of law and of retaliating against a

-55-

pretrial detainee for pursuing petitions in redress of grievances." (emphasis added)); see id. at *27 (noting that the facts related to the "unsanitary cell" incident "form part of the facts and circumstances related to Goguen's core due process claim against Meunier and his retaliation claim against Meunier and Kelly").

Although the evidence implicating Officer Kelly is not particularly well-developed in the record, we do note that the magistrate judge specifically said that there was a genuine issue of triable fact as to her role:

> As for the retaliation claim, . . . there is a genuine issue concerning those officers who supported or directed the imposition of administrative segregation on Goguen prior to completion of the due process procedures outlined in Wolff v. McDonnell, and the cumulative impact of disrupting court conferences, scattering legal papers throughout Goguen's cell, imposing four-point shackles when Goguen accessed the library cart, and using unnecessary force. This claim is viable against Allen, Almeida, Bugbee, Gilblair, Kelly, Meunier, Plourd, and Rizzo.

Id. at *32 (emphasis added). The argument that Officer Kelly should be granted summary judgment is therefore a matter most appropriately left to the district court in the course of further proceedings on remand.

We note also that the defendants' arguments with respect to Officer Kelly suffer from the same infirmities as their more general arguments: They do not acknowledge the sworn testimony in the record that supports the magistrate judge's findings. See R.83 (Goguen Dep.) at 89–90 (describing Officer Kelly's actions in taking Mr. Goguen's legal material when he was going to meet with counsel). Because Officer Kelly's arguments, like those of the other defendants, are fact-based, they are not properly before this court on interlocutory appeal.

## Conclusion

The defendants have not come forward with any purely legal issues that call into question the district court's denial of their motion for summary judgment on qualified immunity grounds. Consequently, we do not have jurisdiction over the defendants' appeal. The appeal is dismissed for want of jurisdiction.

**APPEAL DISMISSED**